James Charles **FROESS**

v.

Leonard Z. **BULMAN.**

**Civ. A. No. 82–0371 P.**

United States District Court, D. Rhode Island.

Nov. 20, 1984.

Judy Ringquist, Newport, R.I., for plaintiff.

Richard P. McMahon, Providence, R.I., for defendant.

## OPINION

PETTINE, Senior District Judge.

The plaintiff doctor, a clinical psychologist, who at the time this action arose was on active duty with the Navy and stationed at the Newport Naval Hospital, Newport, Rhode Island, seeks compensatory and punitive damages from the defendant, a Maryland attorney. This action arises from allegedly defamatory letters written and published by the defendant concerning a psychological diagnostic appraisal made by the plaintiff of a twelve year old female child, the subject of a Maryland custody litigation, who is the daughter of a client of the defendant.

I will decide whether or not 1) the communications were nothing more than an expression of opinion and, therefore, not actionable; 2) the communications were absolutely privileged under Maryland and Rhode Island law as litigation-related correspondence; and 3) the entire action should be dismissed for lack of *in personam* jurisdiction.

## FACTS

The divorced parent of the child, Warren Wood, had been granted legal custody of his daughter, Michele, approximately six years prior to the present controversy. Melody Krause, the mother, now remarried to a military officer attending the Naval War College in Newport, initiated legal action in Maryland to regain custody of her daughter. In a protracted evidentiary hearing, during which the defendant represented Mr. Wood, approximately thirty witnesses testified, and a report concerning Michele's mental condition, as prepared by a psychologist, Dr. Laurelle Machen, was introduced in evidence by the defendant. The court then suspended the trial and granted Mrs. Krause interim custody of Michele, on the condition that a psychiatric examination of Michele be conducted for the purpose of considering whether the mental health of the child required special consideration in making a final determination on the transfer of custody. The report was to be filed with the court and a copy forwarded to the defendant.

Following the foregoing, on September 10, 1981, Mrs. Krause, as a military officer's wife, took her daughter to a Navy pediatrician at the Newport Naval Hospital who, in turn, referred her to a Doctor Douglas Grodin, Chief of Psychiatry at said hospital. This referral requested verification of Dr. Machen's previously reported diagnosis of "Borderline Personality Disorder."

Dr. Grodin selected Dr. Froess to perform the consultation. The travel of the referral is reflected on a hospital form known as a "Consultation Report." This report was initiated by the original doctor—in this case, the pediatrician. He completed the pre-printed headings, which require the referring physician to designate: the department to which the patient is being referred; who is making the referral; the date; the reasons for the requested referral; and a provisional diagnosis. The

doctor receiving the case completes and signs the bottom portion designated as the "Consultation Report." Dr. Froess received this form from Dr. Grodin with the statement under the "Reason for Request" reading: "12 y.o. female involved in custody battle recently won by mom. Previous psych. eval. led to Dx Borderline personality. Part of court proceedings was to order further psych. eval. (follow up care). Please advise as to further care." Under "Provisional Diagnosis" was written: "Borderline Personality."[1]

Dr. Froess saw Michele and her mother, who explained that there had been a previous psychological evaluation of her daughter and that it had been submitted as part of the Maryland custody hearing. The judge in Maryland, according to the mother, questioned the evaluation, and as stated, suspended the hearing, granted interim custody to the mother and ordered a second evaluation. At this time, Dr. Froess received from Mrs. Krause Dr. Machen's report and a copy of the court's order. He interpreted the consultation report as requiring him either to confirm or refute Dr. Machen's findings, and to advise the pediatrician whether or not Michele needed further psychiatric care.

Obviously, Dr. Froess' diagnosis was at odds with that of Dr. Machen. The plaintiff testified that he conducted his psychological evaluation according to accepted standard procedures, which involve acquiring informational history, interviewing both the child and the mother, and reviewing previous reports, mental status tests and observations. However, no psychological tests were performed because, as he stated, "[d]ue to the fact that a battery of psychological tests had been administered to Michele only four weeks before, the tests could not be repeated, since re-tests results would be of questionable validity if repeated so soon." It must be noted that Dr. Froess specifically noted that the history was supplied by the child and her mother, as "alleged," "reported," or "described" by them.

Dr. Froess' findings were typed in under the heading "Consultation Report." In the last paragraph of page 2, he stated that his results did not support the previously established diagnosis of borderline personality disorder. He said, "I find no reason to presume the presence of any emotional or psychiatric disorder in this child. She appears to be socially and emotionally well-adjusted, especially considering the emotional stresses which she has undergone in recent years." He also found that the results of his evaluation did not support the previously established diagnosis of "Borderline Personality" disorder.

A copy of Dr. Froess' report was given to Mrs. Krause and another was filed with the psychiatric division of the hospital. The original was sent to the referral office which, in this case, was a pediatrics department. At the request of Mr. Wood, a copy was mailed to him. Mrs. Krause and Mr. Wood each gave a copy to their respective attorneys. However, Mr. Wood did so with specific directions that the defendant write the letter in question; indeed, Mr. Wood edited the defendant's draft and made certain changes which the defendant claims he "toned down." It was obvious to this Court that Mr. Wood must have become highly agitated after reading Dr. Froess' findings. He testified that he felt the report was a threat to his daughter; feared the effect it would have at the hearing; felt there was a "military conspiracy" against him; believed that at the first hearing in Maryland, "it was as though the judge didn't hear" a thing Dr. Machen said; doubted the authenticity of Dr. Froess' report; knew "the report would be the centerpiece of the hearing;" and felt that if the defendant did not write the letter, he guessed he would have looked for another attorney.

The defendant mailed his letter dated September 25, 1981, to the Chief of Psychiatric Services at Newport Naval Hospital, with copies to his client, the Maryland judge, Mrs. Krause's Maryland attorney,

---

**1.** A photocopy of Dr. Froess' report is reprinted as Appendix A to this opinion.

and the Commanding Officer of the Naval Bureau of Medicine and Surgery. To each copy of the report there was attached a copy of both Dr. Machen's and Dr. Froess' report, together with a copy of the Maryland Court Order. On October 14, 1981, a subsequent letter was mailed by the defendant to all of the above at the same addresses.[2]

Dr. Grodin testified that he holds the plaintiff in the "highest esteem" as an "honest, ethical, careful practitioner". He described him as "a fine upstanding psychologist," "outstanding," whose "treatment and diagnoses are truly impressive," "ranked in top 1% in fitness," "best of his group," "had a potential for a naval career as a clinical psychologist with room for diversification in administrative duties," and with an ability for promotion to the rank of commander. When he received the letter, he described his reaction as one of "disbelief"; "a most shocking thing."

As a result of the defendant's letter, Dr. Grodin received a telephone call from a Captain Robert McCullagh, the head of all Navy psychologists; Dr. Grodin described the captain as one of the persons who "wielded enormous power and influence over what they could do with the officers over whom they had cognizance and responsibility ... they have the final say." In short, he controlled the destiny of a Navy psychologist.

At this time, the plaintiff had approximately four years of active duty service as a reserve officer and aspired to be augmented into the regular service as a career. A prerequisite to a regular commission was five years of active duty. To accomplish this, the plaintiff had requested a twelve month active duty extension, a practice he had successfully employed in the past to extend each of his two year previous active duty periods; as a result, he had acquired four years of service when this incident occurred. The last requested extension, considered after the defendant's letter, was

granted only for six months, at the end of which he was separated from the service before completing a five year term.

Although the evidence is that it cannot be stated with certainty that the defendant's letter aborted the plaintiff's naval career, Dr. Grodin did testify that "Dr. Froess' ability 'to extend and stay on' in the service had become very tentative." This tentativeness had "suddenly come up, that hadn't been there before" the investigation and accusations.

Dr. Grodin stated that augmentation is highly competitive and the selection board processes applicants preliminarily by elimination to narrow the field of considered candidates. He indicated that the procedure of the selection board is to exclude any candidate who had attracted notoriety, a negative reputation, or had been the subject of controversy or pending investigation prior to a review of the service record. He also stated that he had never before seen a complaint letter like defendant's, nor was he aware of any investigation emanating from the Surgeon General's Office in like manner. He also stated that because the author of the letter was an attorney, the letter carried greater weight than if a lay person had written it, because an attorney's words would be taken seriously and presumed valid inasmuch as one assumes an attorney is cautious and correct in what he writes.

In Dr. Grodin's opinion, the letter, by using such terms as "questionable approach," "is such a person in your command," "I feel you feel some pride," "would be concerned by his report," and "inexperience," as well as the whole dominant tone, indicated that what Froess did was substandard, naive, foolish and an attempt to damage Mr. Wood and the child.

Dr. Grodin unequivocally stated, however, that the plaintiff used acceptable procedures. He went on to explain that the incident was unfortunate because an investigation does affect an officer's career.

**2.** The text of defendant's September 25 letter, along with the October 14 follow up letter, are reprinted as Appendix B to this opinion.

Here, he testified, "the harm came from it being sent to the Surgeon General where it came into the hands of administrators who are not familiar with the speciality at issue; they are lay people and thus unable to evaluate the criticism for what it was, unlike at the local level where it would have been written off." However, as I have already stated, he did not know if the investigation aborted the plaintiff's aspiration of becoming a career officer. He further claimed that there is no way of finding out, because board decisions are not made public and the members of the board are not allowed gratuitously to volunteer information, whether it be negative or positive.

This suit was initiated after Dr. Froess was notified that his last request for an extension of active duty had been denied.

The plaintiff testified that for two to three months he suffered severe insomnia and was disturbed and upset. At the end of his fourth year of service, he did not apply for augmentation because he was told his prospects of success were negative due to this incident.

Defendant Bulman responds that he does not feel the letter is libelous; that as a practicing attorney for twenty-five years, he has always represented clients without needless harm to others; and that in this case, he was concerned about the child and mailed the letter to the Surgeon General because he was "desperate" to have her seen by a psychiatrist.

## IN PERSONAM JURISDICTION

The defendant's pre-trial motion to dismiss this action on the ground that this Court lacks *in personam* jurisdiction was denied. He now contends that the denial was narrowly "focused on an alleged fact which has not been supported by any trial evidence and has, on the contrary, been indisputably contradicted by the trial evidence." The defendant argues that the "plaintiff's affidavit, in opposition to the defendant's motion to dismiss, which stated in substance that he was unaware his medical examination and report was involving him with the pending litigation in Maryland and, therefore, he did not initiate anything

which required any letter or communication from the defendant," is at odds with the record in that "the plaintiff testified that he could have declined this medical examination in the first instance," Tr.Vol. 1, p. 25; the consultation sheet received by the plaintiff at the time of his examination showed that the examination had been ordered by the Maryland court because the child was "[involved in a custody battle] and that part of court proceedings was to order further psych. eval. (follow up care)," Tr. Vol. 1, p. 33; and Mrs. Krause told the plaintiff her Maryland attorney was going to use the report in the Maryland court proceedings and had asked for his professional vita, which he had sent. From this evidence the defendant concludes that the plaintiff voluntarily involved himself in the Maryland court action, such that jurisdiction would be proper in Maryland, but not in Rhode Island. In support of this proposition, a number of cases are cited: *Conn v. ITT Aetna Finance Co.,* 105 R.I. 397, 252 A.2d 184 (1979); *Hahn v. Vermont Law School,* 698 F.2d 48 (1st Cir.1983); *McCabe v. Kevin Jenkins and Associates, Inc.,* 531 F.Supp. 648 (E.D.Pa.1982); *Jacobs v. Lakewood Aircraft Service, Inc.,* 493 F.Supp. 46 (E.D.Pa.1980). I need not discuss these cases because I do not take issue with their holdings. Simply speaking, the defendant misses the core of the issue.

In my Memorandum and Order, November 23, 1982, denying the defendant's motion to dismiss, I cited *Rusack v. Harsha,* 470 F.Supp. 285 (M.D.Pa.1978), which held that a court could constitutionally exercise jurisdiction over a nonresident defendant whose only contact with the forum state was mailing allegedly defamatory letters to the plaintiff's place of employment. That is the crux of the matter here and there is nothing in this evidence to the contrary. The defendant's reference to portions of the record, as recited in the foregoing, need no analysis, for even if accepted, they do not defeat jurisdiction in this district.

The *Rusack* court's reasoning is particularly appropriate here:

First, defendant's connection to the state is based upon actions from which plaintiff's claim arose. Secondly, I believe it is foreseeable that if one defames another it will cause harm to that other person within his community, especially when copies of the defamatory material are sent to that community. And by sending those copies defendant ... has, in a sense, purposefully availed himself of the opportunity of conducting an activity in the state.... Furthermore, [the state] ... has an interest in protecting its citizens from harm. Lastly, although much of the evidence regarding whether there has been a tort will be documentary, the evidence concerning whether plaintiff has been injured within his community may, if this action proceeds to trial, involve testimony by ... area residents.

470 F.Supp. at 291 (footnotes omitted).

As I stated in my Memorandum and Order, "as in *Rusack*, the defendant in this case purposefully initiated contact with a Rhode Island party by publishing an allegedly defamatory letter. Accordingly, this Court does not believe that it is unfair to require him to defend a suit concerning the harm which may have been caused by that letter in the form in which the injury is said to have occurred."

In *Elkhart Engineering Corp. v. Dornier Werke*, 343 F.2d 861 (5th Cir.1965), the court held that jurisdiction could be asserted over a foreign corporation that allegedly committed a tort within the state, even though only an isolated transaction was involved. Moreover, the United States Supreme Court has spoken directly to the jurisdictional issue before this Court in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) and *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

In *Calder*, the California court exercised jurisdiction over two Florida newspapermen in a libel action. The libel claim arose out of an article written and edited by defendant-petitioners in Florida and published in a national magazine having its largest circulation in California. The court found jurisdiction was proper in California. To borrow the Supreme Court's holding in *Calder:* "The allegedly libelous [letter] concerned the [Rhode Island] activities of a [Rhode Island] resident. It impugned the professionalism of [a doctor] whose [medical and naval] career was centered in [Rhode Island].... In sum, [Rhode Island] is the focal point both of the [letter] and of the harm suffered. Jurisdiction over [defendant] is therefore proper in [Rhode Island] based on the 'effects' of [the defendant's] [Maryland] conduct in [Rhode Island]." *Id.* 104 S.Ct. at 1486–87 (footnotes and citations omitted). *Cf. Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

I reaffirm my Memorandum and Order of November 23, 1982, which denied the defendant's motion to dismiss for lack of *in personam* jurisdiction.

CHOICE OF LAWS

The defendant contends that since his letter was a communication relevant to pending Maryland litigation, it is absolutely privileged, and he submits that under Rhode Island choice of law rules, the law of Maryland must be applied, since it is the forum which has the most "significant interest" in the child custody litigation in which the defendant was counsel of record. *Woodward v. Stewart*, 104 R.I. 290, 243 A.2d 917 (1968); *Labree v. Major*, 111 R.I. 657, 306 A.2d 808 (1973); *Roy v. Star Chopper Company, Inc.*, 584 F.2d 1124 (1st Cir.1978) (setting forth criteria to be employed applying *Woodward v. Stewart, supra*); *Tiernan v. Westext Transport, Inc.*, 295 F.Supp. 1256 (D.R.I.1969). I fail to understand why this question is raised. The law of Rhode Island and Maryland are not in conflict. Both states have adopted Section 586 of the Restatement of Torts (Second) (1977), defining absolute privilege. *See Adams v. Peck*, 288 Md. 1, 415 A.2d 292 (Md.1980); *Vierira v. Meredith*, 84 R.I. 299, 123 A.2d 743 (1956).

ABSOLUTE PRIVILEGE

■ In *Adams, supra*, the court stated:

The evaluation and investigation of facts and opinions for the purpose of determining what, if anything, is to be raised or used in pending litigation is as integral a part of the search for truth and, therefore, of the judicial process as is the presentation of such facts and opinions during the course of the trial, either in file documents or in the courtroom itself. 415 A.2d at 295.

In *Vieira,* which is still prevailing precedent, the court stated:

We have examined the authorities and it is our opinion that in the public interest we should adopt the pertinent rule which prevails generally in this country, namely, that libelous matter in pleadings filed in judicial proceedings are absolutely privileged where the statements are material, pertinent or relevant to the issues therein; that it is immaterial that the allegations are false and malicious, *Matthis v. Kennedy,* 243 Minn. 219 [67 N.W.2d 413 (1954)]; and that this principle applies even if the libelous statements refer to a person who is not a party to the suit, *Young v. Young,* 18 F.2d 807 [D.C.Cir.(1927)]. However, the alleged libelous matter must be found to be relevant to the proceeding in which it is uttered and the question whether such defamatory matter is relevant or material is a question of law to be decided only by the court. *Ginsburg v. Black,* 192 F.2d 823 [7th Cir. (1951)]. 134 A.L.R. 483, 485. *See* also 53 C.J.S. Libel and Slander, § 104.

84 R.I. at 301, 123 A.2d 743.

The plaintiff argues: that the foregoing cases, *Adams* and *Vieira* are not applicable; that *Adams* addresses an expert witness' report which was admitted in the judicial proceedings; that the court held that since the witness could testify to the substance and content of his report, which was addressed to and requested by the attorney, the report itself would likewise be privileged; "[t]he court did not state that an attorney enjoys the same privilege as a witness;" that *Matthis v. Kennedy,* cited in *Vieira, supra,* found, "the attorney

not absolutely privileged for extra judicial statements even if they related to the proceedings and were intended to protect the client's interest." I am not persuaded by these arguments.

As to *Adams,* the thrust of the court's ruling is that the report was an integral part of the litigation; it matters not that in *Adams* the writer was a witness and in the case at bar he is an attorney representing one of the litigants in the concurrent case. As the defendant argues, "the issue is whether the communication was litigation-related;" this can hardly be disputed.

Plaintiff's second point also misses the mark. In *Kennedy,* the attorney made statements to the managing editor of a newspaper. An attempt to litigate a case in the press affords no protection to an attorney and is a far cry from the factual posture of this controversy. Here, the statements were made to persons who were directly or indirectly responsible for a document that would be used as evidence against the defendant's clients in vital litigation, affecting their interests.

As this Court sees it, the letter was pertinent to the custody controversy and however unbridled were the comments of the defendant, he was advocating the rights of his clients. He did so by attempting to negate the plaintiff's report on the basis that the plaintiff was not a psychiatrist as required by the Maryland court order. The letter was not addressed to individuals without any pertinent nexus to the plaintiff; it was addressed to the plaintiff's superiors, and Dr. Grodin determined that the plaintiff would be the author of the report.

"Freedom of expression and candor" by attorneys has been endorsed by the First Circuit Court of Appeals. In *Blanchette v. Cataldo,* 734 F.2d 869 (1st Cir.1984), applying Massachusetts law, the court stated:

The public policy of permitting attorneys complete freedom of expression and candor in communications in their efforts to secure justice for their clients commends itself to us. The basic elements of such a policy were recognized early in this

Commonwealth by Chief Justice Shaw in the following terms: "[I]t is, on the whole, for the public interest, and best calculated to subserve the purposes of justice, to allow counsel full freedom of speech, in conducting the causes, and advocating and sustaining the rights, of their constituents; and this freedom of discussion ought not to be impaired by numerous and refined distinctions."

*Id.* at 877, quoting *Sriberg v. Raymond,* 370 Mass. 105, 109, 345 N.E.2d 882 (1976) (quoting in part *Hoar v. Wood,* 3 Metc. 193, 197–98 (1841)).

So the only issue here is whether the alleged defamatory matter is relevant or material—that is, is it pertinent to the litigation? As *Vieira* tells us, "whether such defamatory matter is relevant or material is a question of law to be decided only by the court." 84 R.I. at 301, 123 A.2d 743 (citation omitted).

At times, the obvious is more difficult to articulate than the complex. To me, without wishing to be overly simplistic, it seems indisputable that the defendant's letter was litigation-related correspondence. Unquestionably, as described in the course of the testimony, the plaintiff's report was going to be the "centerpiece" of the Maryland litigation; the whole purpose was to use Dr. Froess' report to negate Dr. Machen's diagnosis that Michele had a "borderline personality." The defendant capitalized, as he should have, on the fact the evaluation was that of a psychologist rather than a psychiatrist, as ordered by the Maryland judge. He cannot be faulted for that. The whole letter, though rather expansive, assailed the findings made by Dr. Froess; true, it was done in a rather unsavory manner, but that does not make the letter libelous, as I discuss *infra.* It demanded retraction of statements, recognized the

need to advise the judge and was forwarded to authoritative naval personnel—who could review Dr. Froess' findings and, if they were as unfounded as the defendant claimed, could recognize and acknowledge the deficiencies. *Blanchette* is authority for the proposition that such correspondence must be "broadly construed" and not "be impaired by numerous and refined distinctions."

I conclude that this letter was privileged as litigation-related material.

## DEFAMATION—FACT OR OPINION

Even were defendant's statements not absolutely privileged as litigation-related, however, they are not actionable defamatory statements in any event. The threshold question here must be whether the challenged statements by defendant Bulman are properly characterized as statements of fact or opinion. The Supreme Court has admonished that the First Amendment shields statements of opinion from the reach of state defamation remedies, for "[u]nder the First Amendment, there is no such thing as a false idea. However, pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries, but on competition of other ideas." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (footnote omitted). Rhode Island has recognized the *Gertz* opinion privilege and I find no law to the contrary in Maryland. In *Hawkins v. Oden,* 459 A.2d 481 (R.I.1983), the Rhode Island Supreme Court upheld a directed verdict for a defendant radio announcer, where the remarks he made about a politician were opinions and "the 'facts' upon which the offending statements were based had been fully disclosed." *Id.* at 484.[3]

---

**3.** Noting that *Oden,* and many other cases involving the *Gertz* opinion privilege, involve either public figures or statements about matters of public interest, plaintiff apparently argues that the privilege extends only to such "public" defamation cases. Such an argument finds support in neither precedent nor principle and I reject it. Numerous courts have applied the opinion privilege in cases lacking the public

character plaintiff describes. *See, e.g., Underwood v. Digital Equipment Co.,* 576 F.Supp. 213 (D.Mass.1983) (statements by employer in employee's personnel file); *Adler v. American Standard,* 538 F.Supp. 572 (D.Md.1982) (statements in letter from employer to employee, published to state employment board); *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583 (1980) (statements by professor to university ombudsman

■ In the wake of *Gertz*, the principal task confronting courts has been to formulate appropriate standards for distinguishing fact from opinion.[4] The Restatement (Second) of Torts, which was revised after *Gertz* to reflect the constitutional dimension afforded the opinion privilege by the Supreme Court, *see generally* Christie, *Defamatory Opinions and the Restatement (Second) of Torts*, 75 Mich.L.Rev. 1621 (1977), provides that:

A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

Restatement (Second) of Torts, § 566 (1977). The Rhode Island Supreme Court has cited this formulation with approval. *Hawkins v. Oden, supra*, at 484. It will frequently be difficult for a court to apply such a rule, however, since "statements cannot be neatly divided into ... hemispheres of fact and opinion, and the transition from assertion to fact to expression to opinion is a progression along a continuum." *Ollman v. Evans*, 713 F.2d 838, 845 (D.C.Cir.1983) (Robinson, J., concurring). In a leading case, the Ninth Circuit has suggested useful guidelines for the difficult task of separating fact from opinion:

In sum, the test to be applied in determining whether an allegedly defamatory statement constitutes an actionable statement of fact requires that the Court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must con-

sider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published. *Information Control v. Genesis One Computer Corp.*, 611 F.2d 781, 874 (9th Cir. 1980). The *Information Control* approach has been widely adopted. *See, e.g., Underwood v. Digital Equipment Corp.*, 576 F.Supp. 213 (D.Mass.1983); *Cole v. Westinghouse Broadcasting Co.*, 386 Mass. 303, 435 N.E.2d 1021 (1982); *Myers v. Plan Takoma, Inc.*, 472 A.2d 44 (D.C.App.1983); *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52 (Fla. 1st D.C.A.1981), *pet'n rev. den.*, 412 So.2d 465 (Fla.1982); *see also* Note, Fact and Opinion *After Gertz v. Robert Welch, Inc.: The Evolution of a Privilege*, 34 Rutgers L.Rev. 81, 106–114 (1981). This contextual approach, focusing on the circumstances surrounding the statement in question, incorporates the traditional rule in defamation cases that, in assessing a communication, the court should adopt the viewpoint of the audience to whom the statement was directed. *See* Restatement (Second) of Torts, § 563 (1977). With the foregoing guidelines in mind, I conclude that, as a matter of law, viewed from the perspective of Dr. Grodin and the other intended recipients of the letter, the defendant's statements are privileged statements of opinion.

■ I will not apply the *Information Control* criteria separately to each of defendant's statements, for plaintiff has assembled a lengthy litany of allegedly defamatory utterances. I quote from pages 15–17 of his post-trial brief:

IS THE LETTER DEFAMATORY?

The false and defamatory statements contained in Defendant Bulman's letter of September 25, 1981 can be listed in

---

evaluating student's work). Moreover, the policies of free exchange which underlie the First Amendment could hardly be vindicated by the narrow opinion privilege plaintiff urges me to recognize. The unqualified language used in *Gertz* and the *Restatement (Second) of Torts* no doubt reflects the broad scope the privilege is meant to enjoy.

4. Whether an allegedly defamatory statement is to be deemed an opinion is a question of law, not fact. *See Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *Restatement (Second) of Torts* § 566, comment c, at 173 (1977).

several categories. Mr. Bulman states directly or indirectly:

A) Regarding Dr. Froess:

1) That Dr. Froess is inexperienced or downright professionally rude.

2) That Dr. Froess did not "show enough professional courtesy".

3) That Dr. Froess was not qualified to see the subject child.

4) That Dr. Froess' stated purpose and intent was "to refute" the original diagnosis.

5) That a professional should never "refute another professional".

B) Regarding the Evaluation and Report:

1) That Dr. Froess' evaluation was not performed according to accepted standards.

2) That Dr. Froess' evaluation was not objective.

3) That Dr. Froess admitted that his evaluation or diagnosis was not objective.

4) That Dr. Froess ignored a "material contributory factor".

5) Four statements that Dr. Froess ignored important matters.

6) That a valid diagnosis cannot be made without psychological testing.

7) That Dr. Froess could not make an objective diagnosis without testing.

8) That a psychiatrist would have performed tests as standard procedure in an evaluation.

9) That Dr. Froess "admit[ted] he was unable to conduct a thorough diagnostic interview, investigation, testing, and objective evaluation".

10) That Dr. Froess' report and evaluation should be of "concern" to his superiors.

11) That Dr. Froess' attitude is "troubling".

12) That Dr. Froess "without question accepts her (child) bizarre claims".

13) That Dr. Froess "recognized" the "bizarre" claims as "fostered and nurtured" by the mother.

14) That Dr. Froess had a duty to verify facts and history given to him by his patients.

15) That Dr. Froess personally made false claims regarding the child and her home life.

16) That Dr. Froess colluded with the mother in issuing false statements and an incorrect diagnosis.

17) Stated that Dr. Froess' report was not a "professional diagnosis".

18) Inferred that Dr. Froess was part of a conspiracy to deny the father custody.

19) That Dr. Froess' statement regarding the child's emotional stresses were knowingly false.

20) That Dr. Froess had improper motives in recommending the original diagnosis be purged from the medical record.

21) Stating that part of Dr. Froess' report is "not only false but is defamatory".

22) That Dr. Froess' statement regarding the reason for not retesting the child is "a most shocking thing".

C) Regarding Dr. Machen:

1) That Dr. Froess "insults every qualification, act, test, conclusion and recommendation of Dr. Machen".

2) That Dr. Froess did not respect or show professional courtesy to Dr. Machen.

3) That Dr. Froess sought to refute Dr. Machen.

4) That Dr. Froess had a duty to verify Dr. Machen's credentials or to communicate with her.

5) That Dr. Froess had a professional duty to corroborate and agree with Dr. Machen's diagnosis.

6) That Dr. Froess libelled Dr. Machen.

7) That Dr. Froess' report contained "malicious personal and professional misstatements" regarding Dr. Machen.

8) That Dr. Froess believed that Dr. Machen had "monetary designs" on the child.

9) That Dr. Froess had a personal duty to apologize for all the above.

D) Regarding Mr. and Mrs. Woods:

1) That Dr. Froess stated false claims regarding them.

2) That Dr. Froess libelled them personally.

3) Dr. Froess incorrectly classified their alcoholism.

4) That Dr. Froess' report was a "vicious attack on them".

5) That Dr. Froess had a duty to personally apologize "for the libelous allegations in his report unless he can legally substantiate them".

6) Inferred that Dr. Froess considered alcoholism a "derelict tract" [sic] and that he should have considered the alcoholism of "minor, if any, significance".

E) Regarding the Court and Order:

1) That the Order stated that the child was to have treatment and care.

2) That Dr. Froess should apologize to the court regarding his "monetary designs" belief of Dr. Machen.

3) That Dr. Froess should apologize through the court personally for the libellous allegations regarding the Woods and Dr. Machen.

4) That Dr. Froess had an obligation to the court.

Indeed, a seriatim discussion of each listing proffered by plaintiff would be a needless supererogatory exercise. For each of defendant's statements, viewed "in its totality in the context in which it was uttered," *Information Control, supra,* at 784, is susceptible of the same characterization: these statements reflected the defendant's evaluation of the plaintiff's report. Plainly, all "material background facts [were] accurately set forth along with" the opinion, *Ollman v. Evans, supra,* at 847–48, for the very thing being evaluated—the report—was set forth along with the evaluation. Not one of the statements adduced by plaintiff was not in some important fashion related to the plaintiff's report, nor can I discern any implication that, in writing the letter, the defendant implied that he based his statements on anything other than the report.[5] No matter what Dr. Grodin concluded about plaintiff on the basis of the letter and plaintiff's report, I do not find that, as a matter of law, the letter could have given him any reason to deduce that defendant's statements were other than an evaluation of the report attached to the letter. Dr. Grodin may well have been *persuaded,* by either the report itself or defendant's evaluation of it, that plaintiff was inexperienced and his report naive, substandard and foolish. But the critical point here is, as the Supreme Court stated in *Gertz,* that "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries, but on the competition of other ideas." 418 U.S. at 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (footnote omitted). Hence, it is not for the Court to assess the wisdom of the defendant's opinion, or to punish him for expressing it. The task of refuting his opinions must properly be left to the facts, speaking for themselves, (i.e., the report), or to others with contrary opinions.

Because I conclude that the defendant's statements, even if hyperbolic are, viewed in their context as his evaluations of plaintiff's report,[6] privileged opinions, I hold that they do not constitute actionable defamation.

5. The plaintiff's claim that the defendant's letter asserted that the report attempted to hurt the child and Mr. Wood is divorced of any factual basis.

6. While it is true that the contextual approach set forth in *Informational Control, supra,* mentions that the court should give weight to whether the defendant used "cautionary words" to flag that his statement was opinion, this factor is not all controlling. It is only an item to consider, and it carries little weight where, as here, the circumstances make it plain that the writer was giving an opinion.

Judgment for the defendant who will prepare an order in keeping with this opinion.

## APPENDIX A

| MEDICAL RECORD | CONFIDENTIAL | CONSULTATION | No. _____ |
| --- | --- | --- | --- |

**REQUEST**

TO: _Psychiatry_   FROM: _(Requesting physician or activity)_ _Sales_   _9/10/81_

REASON FOR REQUEST (Complaint and findings)

_12 y.o. female involved in custody battle recently won by mom. Previous psych eval → Dx Borderline personality. Part of court proceedings was to order further psych eval (follow up care)_

PROVISIONAL DIAGNOSIS

_? Borderline Personality_   _Please advise as to further care_

DOCTOR'S SIGNATURE _R Willgren_   APPROVED   PLACE OF CONSULTATION ☐ BEDSIDE ☐ ON CALL   ☐ ROUTINE ☐ TODAY ☐ 72 HOURS ☐ EMERGENCY

**CONSULTATION REPORT**

### PSYCHOLOGICAL EVALUATION

The patient, Michelle Wood, is a twelve year-old girl who was seen at this clinic for psychological evaluation as noted above on 10 September 1981. Custody of Michelle was recently awarded to her biological mother, with the stipulation that further psychological evaluation be carried out to confirm or refute the diagnosis of Borderline Personality Disorder, with histrionic features, which was previously established by a psychological evaluation performed by L.H. Macken, Ph.D., on 14 August 1981.

Background information was provided by Michelle's mother and by Michelle herself. It should be noted that Michelle's mother, Mrs. Melody Krause, maintained that the background information contained in the previous psychological evaluation by Dr. Macken was inaccurate in many respects. According to Mrs. Krause, Dr. Macken relied solely on information provided by Michelle's father and stepmother for the history. Mrs. Krause was reportedly not interviewed even though she was present during the evaluation. According to Michelle, she was not questioned about her background or home situation. As an infant, Michelle suffered a metabolic disorder called celiac syndrome, which has since resolved. Physical development was otherwise unremarkable. She experienced learning difficulties when she entered first grade and was held back after her first year of school. She attended special classes for children with learning difficulties for a time and was then returned to the regular classroom. Since that time she has performed satisfactorily in school. For the past five years, Michelle has lived with her father and stepmother. Both Michelle and Mrs. Krause described her father as a reformed alcoholic and her stepmother as an active alcoholic who was hospitalized for alcohol rehabilitation on three

*(Continued on reverse side)*

SIGNATURE AND TITLE   DATE

**J. FROESS, LCDR MSC USN**

IDENTIFICATION NO.   ORGANIZATION   REGISTER NO.   WARD NO. **E**

PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle grade; rank; rate; hospital or medical facility)

_Wood Michelle_   B F A O

WOOD MICHELE D   DOB
3 SEP 69   849 519 7485
ROBERT
USA 02 551 50 7485   LTC

CONSULTATION SHEET
STANDARD FORM 513 (Rev 9-77)
Prescribed by GSA/ICMR
FPMR 101-11 806-8
513-107

APPENDIX A—Continued

CONFIDENTIAL

Revised August 1956
Bureau of the Budget
Circular A-32

GPO 443-16-81472-1 460-948

| CLINICAL RECORD | Report on _____<br>or<br>Continuation of S. F. _____513_____<br>(Strike out one line)  (Specify type of examination or data) |

(Sign and date)

occasions during the past five years, reportedly without success. This home situation was described as an extremely chaotic atmosphere, due primarily to the step-mother's unpredictable behavior. Instances of both physical and emotional abuse of the children were described by Michelle. For example, the stepmother reportedly once threatened  suicide in front of the children when she learned that she was to be re-hospitalized. Physical abuse usually occurred when she was intoxicated and included throwing things at the children and hitting them. Michelle stated that she often lived in fear of her stepmother's anger, and she expressed bitterness toward her father for not intervening with her stepmother. On a recent visit with her mother, Michelle requested to remain with her and not return to her father's home, which initiated the recent custody hearing.

Due to the fact that a battery of psychological tests had  been administered to Michelle only four weeks before, the tests could not be repeated, since re-test results would be of questionable validity if repeated so soon. The evaluation therefor consisted of a diagnostic interview with Michelle and a separate interview with her mother.

Michelle presented as a bright, happy, articulate child. She was pleasant, well-groomed and cooperative. Rapport was quickly and easily established and maintained. She interacted with me in a mature, spontaneous and relaxed fashion. Her manner was one of quiet self-assurance; she was not withdrawn or moody. She related to me in an open, candid fashion. She described herself in positive terms, showing no signs that she didn't like herself or felt like a failure. Cognitive functioning was not impaired. There was no evidence of psychosis, distorted perception of reality, affective disorder (depression/mania) or organic brain dysfunction. She reportedly does well in school in all subjects except math. She indicated that she had "lots of friends" at school and her outside interests include roller skating and "birds". She expressed enthusiasm about returning to school this week. Observation of her interactions with her mother before and after the evaluation suggested a warm and affectionate relationship between mother and daughter.

The results of this evaluation do not support the previously established diagnosis of Borderline Personality Disorder, with histrionic features. In fact, I find no reason to presume the presence of any emotional or psychiatric disorder in this child. She appears socially and emotionally well-adjusted, especially considering the emotional stresses which she has undergone in recent years.

-2-

(Continue on reverse side)

| PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle; grade, date; hospital or medical facility) | REGISTER NO. | WARD NO.<br>E |

WOOD, MICHELLE

WOOD MICHELE D        SSA
7 SEP 69          349 5595
A. JERT            LTC
USA  02 551 50 7485

B
F
A
O

REPORT ON _____ or CONTINUATION OF __513__

Standard Form 507
507-104

APPENDIX A—Continued

CONFIDENTIAL

Circular A-32

| CLINICAL RECORD | Report on _____ |
| | or |
| | Continuation of S. F. _____ 513 |
| | (Strike out one line)  (Specify type of examination or data) |

(Sign and date)

An individual or child with Borderline Personality Disorder should, by definition, exhibit "instability in a variety of areas, including inter-personal behavior, mood and self-image" (from Diagnostic and Statistical Manual-III, the source book for all psychiatric diagnoses). I am unable to find evidence of present or past emotional instability in any of the above areas. Further, one would expect serious impairment of social relations and academic performance if in fact such a serious disorder were present, since by definition, a personality disorder will, "cause either significant impairment in social or occupational functioning or subjective distress". Yet, from the information available to me, neither social or academic functioning has been impaired in this child, nor is she in distress. On the contrary, even the previous psychological report by Dr. Macken noted that Michelle "has become more social and outgoing during the past six years, (her father and stepmother) are proud of her performance in school and have felt that her inter-relationships within the family were good". I believe such a behavioral description to be entirely inconsistent with the diagnosis of Borderline Personality Disorder. Finally, of the eight diagnostic criteria for this diagnosis listed in the Diagnostic and Statistical Manual-III, I find no evidence to suggest that any apply to Michelle.

Impression: No apparent emotional or psychiatric disorder.

Recommendations:
1. Psychotherapy is not indicated.
2. An appointment for a six-month follow-up evaluation will be made to assess Michelle's emotional and psychological status and school performance.
3. If at the six-month follow-up, there is no further indication of emotional disturbance, I recommend that the previous evaluation be purged from her records, since that diagnosis, if inaccurate, could prove very damaging to her in the future.

*James Froess, Ph.D.*
JAMES FROESS
LT, MSC, USNR
CLINICAL PSYCHOLOGIST

-3-

(Continue on reverse side)

| PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle; grade; date; hospital or medical facility) | REGISTER NO. | WARD NO. |
| | | E |

WOOD, MICHELLE

WOOD MICHELE D     DDA
3 SEP 69      B49 5595
ROBERT          LTC
02 551 50 7485

B
F
A
O

REPORT ON _____ or CONTINUATION OF ___513___
Standard Form 507
507-106

APPENDIX B

September 25, 1981      Naval Medical Center

Chief                              Naval War College

Psychiatric Services      Newport, Rhode Island 02840

APPENDIX B—Continued
CONFIDENTIAL
RE: JAMES FROESS, LT.
MSC, USNR
Clinical Psychologist
a/k/a J. Froess
LCDR MSC USN

Dear Sir:

I am an attorney involved in a matter now before the Circuit Court for Anne Arundel County, Maryland, involving the custody and psychiatric care of Michele Wood, age 12 years. Michele is presently in the custody of her mother (my client is her father) who is divorced from Michele's father. The mother, Melody Krause, is married to LTC Robert Krause, a student at the Naval War College. I received a copy of the Consultation Report (A) attached hereto. Due to the questionable approach contained in the Report, as well as the discrepencies as to who wrote the report, I am bringing this matter to your attention for your immediate action.

The Maryland Court on August 26, 1981, Ordered (B) Michele Wood to be seen by a *psychiatrist*, not a psychologist, for treatment in accordance with a report prepared for that Court by Lorelle H. Machen, Ph.D., Certified Psychologist. Dr. Machen's report to the Court is attached hereto (C).

For your information, Dr. Machen is a Psychologist, certified by the Maryland State Board of Examiners, in private practice in Annapolis, Maryland, with an outstanding Statewide reputation as a leading child psychologist. In June, 1981, she stepped down after eighteen years as Chief of Psychological Services of the Anne Arundel County Public Schools (one of the largest school systems in the State). She has wide experience in dealing with children suffering from various degrees of emotional disturbance. She is a recognized expert in child abuse and serves on Child Abuse Panels. She has frequently appeared as an expert before the Courts and administrative bodies on matters dealing with children, their emotional problems, as well as being involved in how the emotional problems are involved in the children's social and educational experiences.

You will note that on the first page of the Consultation Report there appears "J. Foess, LCDR MSC USN" and on the third page there appears "James Froess, Lt., MSC, USNR, Clinical Psychologist." For purpose of this letter I will refer to him as "Lt. Froess." My initial questions to you are—is such a person in your command? Is he a Bond Certified child psychologist? Why does the discrepancy exist? If he is on your staff, would you please provide me with his full qualifications. I am especially interested in his qualifications to see a child such as Michele, who has received an objective diagnosis of Borderline Personality Disorder with Histronic features (DSMIII 301. 83), with a professional recommendation of psychiatric evaluation and intensive psychotherapy. Dr. Machen reached this serious conclusion after an interview with Mr. and Mrs. Wood, who had been her "parents" for more than five years. Contrary to Mrs. Krause's representation, she was free to discuss and contribute anything she wished to Dr. Machen's evaluation. Then, Dr. Machen fully interviewed Michele, but based her conclusions mainly on her extensive testing of Michele. As a person involved in psychiatric services, I am sure you will respect that technique.

I believe you feel some pride and responsibility for matters coming from your Service and therefore, if Lt. Froess is on your staff, I believe you (as I was) will be concerned by his report.

I have briefly, and not completely, set out Dr. Machen's credentials and qualifications above. These were available to Lt. Froess. One would hope that a practicing psychologist would, at least, show enough professional courtesy to give some respect to a fellow psychologist's extensive diagnosis of Michele. But, Lt. Froess either from inexperience or downright professional rudeness insults every qualification act, test, conclusion and recommendation of Dr. Machen. Lt. Froess admits he was unable to conduct a thorough diagnostic interview investigation, testing and objective evaluation of Michele. Unfortunately, he set his premise out in the first paragraph of his

APPENDIX B—Continued

Report when he shows as one of his purposes—"... to refute the diagnosis of Borderline Personality Disorder, with Histronic features, which was previously established by a psychological evaluation performed by L.H. Machen (sic), Ph.D., on 14 August, 1981." The Order of Court was for the child to receive necessary psychiatric care. The Court would never order nor should a professional ever seek to "refute" another professional. This attitude of Lt. Froess is troubling.

It should be noted that Michele had some early school difficulties prior to Mrs. Krause's leaving. It was discovered she could not count, did not know her colors and other such matters. Dr. Machen as the School's Chief of Psychological services, was briefly involved in a conference with the present Mrs. Wood regarding Michele. Dr. Machen and the school were satisfied that the present Mrs. Wood, a qualified school teacher, could and did handle the problems.

After extensive psychological testing and evaluation Dr. Machen concluded that Michele had "inadequate emotional controls" which "cause her to distort reality" and that "(A)t this point, she is living in a world of fantasy such that her ties to reality are seriously weakened...." It is this child that Lt. Froess accepts as being free of any emotional problems and without *question accepts* her bizarre claims, which he recognized as being fostered and nutured by Mrs. Krause.

If Lt. Froess or you wish to believe Dr. Machen may have monetary designs on Michele, I call your attention to the fact she recommends psychiatric intervention, as Michele's emotional disturbance is to severe for a non-medical practitioner such as herself to handle. In fact, such a belief would be foolish. Therefore, Lt. Froess should apologize to Dr. Machen, Mr. and Mrs. Wood, Michele, and the Court.

The material history as recited in Dr. Machen's report, as painful as it may be to Mrs. Krause, is true. A material contributory factor ignored by Lt. Froess is that Mrs. Krause (for whatever reason) did voluntarily separate from Michele when the child was five (5) years old and Michele was actually raised by Mr. Wood and his present wife. Mrs. Krause admittedly had no present or actual personal knowledge of the Wood family, the home and of Michele for a period of five (5) years. (Mrs. Krause admits no knowledge of such things as Michele's school, pediatrician, etc.). In the last few years Michele visited with her mother in Texas about three or four weeks each year. She had frequent telephone contact.

It is unfortunate that Lt. Froess recited facts about third persons without question and without seeking some verification. Michele did not have "celiac syndrome" she had early learning difficulties which were resolved as set out above; Michele never attended special classes for children with learning difficulties; and she has lived with her father since she was adopted by Melody and Mr. Wood. Further, both Mr. and Mrs. Wood are recovering from the disease of alcoholism (an alcoholic is not "reformed.") Mrs. Wood is not an "active alcoholic" and early this year voluntarily entered an alcoholic rehabilitation facility (for the first and only time) and has been professionally determined to be fully recovering. The home and the loving relationship of members of the family have been highly acclaimed by many persons, from the nun who is the principal of Michele's school to neighbors who frequented the house. The entire characterization appearing on the first paragraph of page "2" of the Report are not only false but is defamatory.

As I am sure you are aware, alcoholism is not a "derelict" tract. In this case it is of minor, if any, significance. The "family" in which Michele has lived for the past five years consisted of Mr. Wood, a Certified Public Accountant; Mrs. Wood, a housewife active in community and religious activities; and Michele's "brothers" (children of Mrs. Wood by a previous marriage) ages 16, 13 and 12 (ten days older than Michele). There was extensive extended family from Mrs. Wood. Michele was recognized as a

APPENDIX B—Continued

"granddaughter" "cousin" "niece", etc. She reciprocated.

All of the children (except the 16 year old) attended St. Mary's Elementary School, a Catholic school in Annapolis. They were all above average students. The principal testified in Court that none of the children (including Michele) had any problems in school or out of school evidencing any home or social problems. (See Lt. Froess diagnosis quote cited below). The entire family are devoted practicing Catholics. Michele and her "brothers" participated in religious activities of their church, St. Mary's. Michele seemed very happy in her faith. Mrs. Krause, a non-catholic has verbally objected to Michele's being a Catholic. Michele had a close relationship with the nuns.

Prior to Michele leaving for the recent summer visit she hugged and kissed Mr. and Mrs. Wood and the boys and repeated how she would miss them. What occurred when she was taken by the Krauses contributes to the psychiatric puzzle which must be addressed. Ignoring it will not resolve it.

A most shocking thing from your standpoint should be Lt. Froess' report is his statement that "(D)ue to the fact that a battery of psychological tests had been administered to Michele only four weeks before, *the tests could not be repeated,* since re-test results would be of questionable validity if repeated so soon. The evaluation therefor consisted of a diagnostic interview with Michele and a separate interview with her mother." (Emphasis added).

Without some testing, how could Lt. Froess make an objective diagnosis of a child he had never seen before, but who had been tested by a highly qualified practitioner who found Michele had evidenced serious emotional problems?

Had any of Lt. Froess' unfounded claims of Michele's home life existed, (quoting Lt. Froess) "... one would expect serious impairment of social relations and academic performance if in fact a serious disorder were present, since by definition, a personality disorder will, 'cause either significant impairment in social or occupational functioning or subjective distress ...' ..."

Col. and Mrs. Krause had Michele's report card which showed *no* academic or social problems. Why Lt. Froess ignored it is something I assume will be part of your inquiry to him about this matter.

Additionally, Michele had stopped playing with dolls about two years ago. When she was last observed, after a month with the Krauses, she had regressed to playing with dolls. This regression troubled Dr. Machen and the Woods. The Krauses saw no problem in this regression or in any of the other emotional problems reported by Dr. Machen. Lt. Froess' report seems to be in coordination with the Krauses wishes, rather than any professional diagnosis for or by a psychiatrist as ordered by the Court.

Mr. and Mrs. Wood require an explanation from Lt. Froess as to the basis for his vicious attack on them. He states "She (Michele) appears socially and emotionally well adjusted, especially considering the emotional stresses which she has undergone in recent years. What are the "emotional stresses?" She has undergone? The evidence has shown there to be none. A fact *confirmed by Lt. Froess'* subjective findings.

Further, I assume Lt. Froess had no prior acquaintance with the Krauses, yet he totally ignores any inquiry into their history as parents. Did it not, at least, tickle his psychological interest as to why as disclosed to him in Dr. Machen's report, Mrs. Krause had granted legal custody of Michele and Troy, her own natural child by a previous marriage, to Mr. Wood.

Finally, I respectfully pray and request that within five (5) days from the date hereof:

1. That you personally see that Michele is immediately seen by a qualified child psychiatrist.

2. That a psychiatric report be provided by the child psychiatrist to the Honorable, Nathaniel Hopper, Judge, Circuit Court for Anne Arundel County, Annapolis, Mary-

APPENDIX B—Continued

land 21401. (This was to have been done by the Krauses before September 25, 1981).

3. That, if Lt. Froess is under your command, you please provide me and the Court with his verified full credentials.

4. That, if Lt. Froess is under your command, I would request that you have him personally (through the Court or this office) apologize to Mr. and Mrs. Warren Wood, and each of them, for the libelous allegations in his report, unless he can legally substantiate them.

5. That you personally investigate how such an important matter as the mental and physical health of Michele was handled, and, if you will, please report that matter to the Court and myself.

6. That, if Lt. Froess is under your command, I would request you have him personally apologize to Dr. Lorelle Machen for the malicious personal and professional misstatements appearing in his report.

If you require any additional information to accomplish the requested psychiatric evaluation, this office, Dr. Machen, and Michele's principal and teachers at St. Mary's Elementary School, Annapolis, Maryland, 21401, and any other source available to us, will be happy to cooperate. Lt. Col. and Mrs. Krause were fully aware of this fact prior to their coming to Newport.

The necessity of writing this letter is not to embarrass Lt. Froess, but to see that this important matter is not ignored. This is my duty to the Court and Michele.

Thank you for you anticipated cooperation.

> Very truly yours,
> /s/ Leonard Z. Bulman
> Leonard Z. Bulman

LZB:nl

CC: Mr. and Mrs. Warren Wood

The Honorable, Nathaniel Hopper, Judge

Wayne Kosmerl, Esquire

Commanding Officer Naval Bureau of Medicine and Surgery

---

October 14, 1981

Commanding Officer

Psychiatric Services

Naval Medical Center

Naval War College

Newport, Rhode Island 02840

> RE: JAMES FROESS, LT.
> MSC, USNR
> Clinical Psychologist
> a/k/a J. Froess
> LCDR MSC USN

Dear Sir:

Thank you for your response to my letter of September 25, 1981, regarding Lt. Froess and the Michele Wood matter.

A hearing before the Circuit Court has been set for October 23, 1981. At that time I would like to report to the Court as to what steps have been taken. Therefore, I would appreciate more specific response from you.

I have received unofficial information that Lt. Col. Krause and his wife (Michele's mother) have reluctantly contacted a civilian psychiatrist. But, under the circumstances we would appreciate your monitoring the situation.

Also, and no less important, Lt. Froess has not apologized or otherwise contacted Dr. Lorelle Machen. This too requires your assistance.

Again, thank you for any attention you have given and will give in this matter.

> Very truly yours,
> /s/ Leonard Z. Bulman
> Leonard Z. Bulman

LZB:nl