John P. HAWKINS

v.

Kurt ODEN, et al.

No. 80–33–Appeal.

Supreme Court of Rhode Island.

April 29, 1983.

John F. McBurney, Robert J. Rahill, Pawtucket, for plaintiff.

Joseph B. Cavanagh, Providence, for defendants.

## OPINION

SHEA, Justice.

This matter is before the court on the plaintiff's appeal from a directed verdict entered for the defendants. The Superior Court suit for defamation arose out of statements made by the defendant Kurt Oden during his regular radio talk shows broadcast by the defendant Crohan Communications Company. The statements related certain actions of the plaintiff, John P. Hawkins. At the end of the plaintiff's case, the defendants moved for a directed verdict. The trial justice granted the motion. We affirm.

At the time of the events giving rise to this controversy plaintiff was the Majority Leader of the Rhode Island State Senate. Concurrently, he also served as vice chairman of the Joint Committee on Legislative Affairs.[1] This committee is a permanent legislative committee made up of members of the House of Representatives and the Senate. It has the exclusive responsibility and authority to handle all administrative matters affecting the operation of the General Assembly. General Laws 1956 (1979 Reenactment) §§ 22–11–1 to 22–11–6. As we have stated, defendant Oden was employed by defendant Crohan Communications Company as a host for a radio talk show. On this show, he discussed matters of interest with members of the public who telephoned the station during the broadcast. The conversations between Mr. Oden and the callers were broadcast to the public while they took place.

The events that provide a basis for this case are neither complicated nor disputed. During Mr. Hawkins's vice chairmanship, the Joint Committee on Legislative Affairs entered into the lease of a building owned by Mr. Hawkins as a joint tenant with his law associate. The building had been purchased for $62,000 approximately one year prior to the lease and had been substantially improved by the owners who financed the improvements through mortgages. The lease to the state required the payment of $21,000 annually for a period of five years. This arrangement was entered into for the purposes of providing office space for the newly created office of Auditor General.

1. By statutory authority, the Senate Majority Leader serves as vice chairman of the Joint Committee and the Speaker of the House acts as its chairman.

Once this particular transaction became public knowledge, it was the subject of much discussion. In the week prior to Oden's broadcast, this transaction was extensively detailed by newspaper and radio news stories.

Furthermore, during the days preceding the talk show in question, other activity on the part of plaintiff in the conduct of his public affairs prompted media attention. The plaintiff was criticized for certain action taken by the Lottery Commission, of which he was chairman. The criticism concerned the commission's lease for its headquarters. He also was criticized for his alleged involvement in the then-celebrated Peter Pan Diner incident. This eating establishment had been transported from Providence and deposited on state-owned land in Narragansett. The owners of the diner were clients of plaintiff's law associate. Despite local outcry, the diner remained on state land until the termination of a Superior Court hearing initiated by the Attorney General. The media also provided extensive coverage, as well as criticism, of Mr. Hawkins's decision as Senate Majority Leader to remove the press from the Senate floor. His order restricted the press to the gallery. The press claimed that this new policy presented serious practical problems for the various news people covering the Senate proceedings. Finally, Mr. Hawkins's name was in the news once again when the Governor in his Inaugural Address called for conflict-of-interest legislation. Later, when questioned about the lease of the plaintiff's property to the state, the governor initially declined comment but, when pressed, agreed that had such a lease been proposed to the executive department, he would not have approved it.

The media coverage reached a crescendo in the days immediately prior to the talk-show episode. The newspapers were replete with editorials and columns commenting very unfavorably on plaintiff's involvement in these activities. Suffice it to say that in January 1975 Mr. Hawkins's public affairs received considerable attention from the press. We refer to these criticisms only to re-create the setting in which the alleged defamatory statements were made.

On January 11, 1975, a Saturday morning, defendants' talk-show program was scheduled for the hours of 9 a.m. to 1 p.m. The defendant, Oden, in the opening remarks, as was his practice, made reference to newspaper comments about plaintiff and then began to take calls. Many of the calls discussed the situation in the Senate, the majority leader, and affairs involving the State House generally. During the broadcast, in response to a caller who was obviously sympathetic to the majority leader, Mr. Oden characterized plaintiff's conduct concerning the lease as "reaching into the public till with both hands" and "stealing public money." Relying on these statements, Mr. Hawkins brought this lawsuit based on defamation.

The case before us comes within the doctrine enunciated by the United States Supreme Court in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), later refined in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) and *Orr v. Argus-Press Co.,* 586 F.2d 1108 (6th Cir.1978). These principles were applied by this court in *DeCarvalho v. daSilva,* R.I., 414 A.2d 806 (1980).

In *Sullivan,* the United States Supreme Court first announced the role of the First Amendment guarantee of freedom of speech in the context of libel and slander actions. There the court held that in certain circumstances, the right of the media to express opinions about others is protected by the First Amendment.

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' —that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*

*Co. v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706.

Later, in *Gertz,* the Supreme Court said:

"Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.,* 418 U.S. at 339–40, 94 S.Ct. at 3007, 41 L.Ed.2d at 805.

Then, in *Orr v. Argus-Press Co.,* 586 F.2d 1108 (6th Cir.1978), the Sixth Circuit Court of Appeals, citing *Gertz,* held that

"It is now established as a matter of constitutional law that a statement of opinion about matters which are publicly known is not defamatory." *Id.* at 1114.

That court discussed the then-recent revision in the Restatement of Torts, which adopted the *Gertz* principle. The Restatement (Second) *Torts* § 566 at 170 (rev. ed. 1977) provides:

"A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."

It also states:

"It is the function of the court to determine whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct * * *." Restatement (Second) *Torts* § 566, comment c at 173.

Applying these principles to the case before us leads undeniably to the conclusion that the trial justice acted properly in directing a verdict for defendants.

This court stated the rules for considering such a motion in *Evans v. Liguori,* 118 R.I. 389, 374 A.2d 774 (1977):

"When a motion for a directed verdict is made, the trial court and * * * this court on review must consider the evidence in the light most favorable to the party against whom the motion is made without weighing the evidence or considering the credibility of the witnesses and extract from that record only those reasonable inferences that support the position of the party opposing the motion, * * *. If there exist issues of fact upon which reasonable men may differ, the trial court has no alternative other than to let the jury decide them." [Citations omitted.] *Id.* at 394, 374 A.2d at 776; *see also Fox v. Allstate Insurance Co.,* R.I., 425 A.2d 903, 905 (1981).

Here, there was no dispute over the facts. Mr. Hawkins's Senate membership and his connection with the lease and with the property leased was well known and was referred to several times by Mr. Oden and the callers during the broadcast. The allegations of impropriety, that is, "stealing public money" and "dipping into the public till," were Mr. Oden's opinions that he labeled as such during his conversation with the talk-show caller. Typical of his statement is the following:

"I would make the assumption that if I were the vice chairman of a committee, that was dealing with public money, that would be reaching into the till with both hands."

Mr. Oden stated several times during the broadcast that Mr. Hawkins had done nothing illegal, that he had not broken any law.

■ No one could seriously argue that Mr. Hawkins, a member of the Rhode Island Senate and the majority leader of that body, was not a public official and a public figure. His name was known to everyone in the state who read newspapers or listened to or viewed news broadcasts during the week or more preceding the date that the statements were made. Without question the "facts" upon which the offending statements were based had been fully disclosed.

Mr. Hawkins concedes that a statement of opinion may be privileged if it is based

on publicly disclosed facts. However, he contends that a radio talk show, broadcast over a four-hour period, is not entitled to the same constitutional privilege as the printed word. He argues that people tuning in at different times might be unaware of the allegedly disclosed facts and might therefore assume that the opinion expressed is a statement of fact rather than an opinion.

We are not aware of any special rule or provision having to do with talk shows as opposed to written statements. The Restatement ·(Second) *Torts* § 568A (1977) makes clear that "[b]roadcasting of defamatory matter by means of radio or television is libel, whether or not it is read from a manuscript" thus the "broadcaster [is placed] upon the same footing as the publisher of a newspaper." *Id.* at comment a.

In *Gertz v. Robert Welch, Inc.,* 418 U.S. at 343, 94 S.Ct. at 3008, 41 L.Ed.2d at 807, the Court held that the New York Times privilege should be available to publishers and *broadcasters* of defamatory falsehood concerning public officials and public figures. This court has held specifically that allegedly defamatory broadcasts over a local radio station were as privileged, and thus not actionable, as printed publications of the same statements. *DeCarvalho v. daSilva,* R.I., 414 A.2d 806 (1980). In that case the privilege was upheld even though the disclosed facts on which the derogatory comments were based contained several serious inaccuracies. *Id.,* 414 A.2d at 809. In the case before us, the parties have no disagreement regarding the operative facts.

We hold, therefore, that the plaintiff has failed to establish that the trial justice was in error in granting the motion for directed verdict. The plaintiff's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers of this case are remanded to the Superior Court.