**Robert L. GORDON, M.D., et al.**

v.

**ST. JOSEPH'S HOSPITAL.**

**No. 82–547–Appeal.**

Supreme Court of Rhode Island.

July 18, 1985.

William Y. Chaika, Chaika & Loffredo, Cranston, for plaintiff.

Michael T. Wallor, James T. Murphy, Hanson Curran & Parks, A. David Tammelleo, Regan Associates, Providence, for defendants.

## OPINION

SHEA, Justice.

This is an action wherein the plaintiffs, Robert L. Gordon, M.D., and Michael A. DeLuca, M.D., seek compensatory and punitive damages for defamation of character arising out of an allegedly libelous publication. After trial in Superior Court, jury verdicts were returned in the amount of $175,000 in compensatory damages for each plaintiff. The defendant's motion for a new trial was granted on the issue of damages only unless each plaintiff agreed to file a remittitur of $160,000. The plaintiffs appeal from the granting of the defendant's motion for a directed verdict on the issue of punitive damages and from the remittiturs ordered. The defendant, St. Joseph's Hospital, appeals from the denial of its motion for a directed verdict on the issue of compensatory damages, the denial of its motion for a new trial on all issues, and certain evidentiary rulings made by the trial justice. We affirm.

In October 1973 plaintiffs, doing business as Emergency Physician Associates, a Rhode Island partnership, entered into a three-year contract with St. Joseph's Hospital to provide services in its emergency room. The contract contained a termination clause that allowed unilateral termination by either party upon 120 days' written notice.

In mid-1974 plaintiffs contacted the then administrator of the hospital, Robert A. Vitello (Vitello), to renegotiate their contract. Considerable correspondence was exchanged, and several meetings were held. In a letter dated July 15, 1974, plaintiffs formally proposed changes in collection and billing procedures and in their combined status as emergency-room physicians. In particular they requested not only recognition of the emergency room as a separate and distinct department within the hospital but also increased remuneration for their services comparable with that of other area-hospital emergency-room physicians.

On August 1, 1974, plaintiffs wrote to Vitello apprising him that Emergency Physicians Associates would terminate its contract with the hospital as of November 30, 1974, pursuant to and in conformity with the 120-day termination clause of the contract. In a letter dated August 5, 1974, Vitello rejected plaintiffs' prior proposals, accepted their termination notice, and requested that Emergency Physicians Associates continue providing in the interim "an exemplary quality of emergency medical service."

Addressing the nursing staff of the emergency room in a letter dated August 14, 1974, Vitello stated:

"As we reviewed with you last Thursday, it has been decided by the Emergency Physicians Associates to terminate their contract with the Hospital (*which they have a right to do*), and the Hospital has accepted this termination." (Emphasis added.)

Two days later, Vitello sent a letter dated August 16, 1974, to all members of the hospital's medical staff (the full physician complement amounting to 400 members) that stated:

"Dear Doctor:

"As you know, St. Joseph's Hospital provides emergency medical services in our Emergency Room at the Providence Unit through a contractual relationship with Emergency Physicians Associates. However, *Emergency Physicians Associates is no longer willing to honor the contract in its present form.*

"Therefore, effective midnight November 30th, the Hospital will assume the responsibility for the provision of emergency medical services * * *." (Emphasis added.)

Alleging that the letter contained a libelous statement that falsely accused them of breaching their contract, plaintiffs instituted suit for libel against St. Joseph's Hospital.[1] At trial plaintiffs testified that the letter injured their reputations and caused them to experience professional and social rejection even while they were fulfilling their duties at St. Joseph's Hospital in an "exemplary" manner. Because the letter gave the impression that plaintiffs had deserted the hospital and had left it to the medical staff of the hospital to fill the void, plaintiffs contended that they were shunned by their professional colleagues and, as a result, found their medical practices adversely affected. They asserted

that this situation was emotionally upsetting to them.

Doctor Frank Detorie, a former staff doctor at St. Joseph's Hospital, testified that the letter gave him the impression that "the physicians who were working in the emergency room were deserting it" and that he "would be forced to fill the void."

Doctor Nicholas Iannuccilli testified that it was brought to his attention "[t]hat [plaintiffs] had breached a contract with St. Joseph's Hospital" and that "[t]he reaction was unfavorable toward Doctors DeLuca and Gordon, mainly from physicians that probably didn't know what had occurred." He expressed concern that his radiology practice, with which Dr. DeLuca was associated as a partner, would be adversely affected "since the practice is based mainly on referrals from outside physicians." Doctor DeLuca testified that after his departure from the hospital he rarely got any referrals from members of the St. Joseph's Hospital staff and his practice "never picked up." He left the partnership after about one year.

Doctor Iannuccilli also testified that when Dr. Gordon's name had come up for appointment at Fogarty Hospital, "it was brought up by someone at the meeting that Doctors Gordon and DeLuca were having problems with St. Joseph's Hospital and [that] * * * his appointment should be strongly considered in view of the problems they were having rather than a carte blanche, open door admission." In fact, Dr. Gordon never received his appointment to this hospital or, for that matter, to any other hospital in Rhode Island.

Doctor DeLuca's wife testified that invitations to social events and Christmas cards from acquaintances dwindled. She testified that her husband was bothered by the rejection of his peers and felt badly about the loss of prestige to his family name. She stated that she started discussing with him the possibility of relocating to

---

1. Although Robert A. Vitello was a named defendant, he died prior to trial. The count against him was dismissed without prejudice to any claim plaintiffs had against St. Joseph's Hospital.

another state. Doctor DeLuca ultimately relocated with his wife and children in Texas.

During the course of the trial, the trial justice overruled a number of defendant's hearsay objections to testimony presented by plaintiffs. On appeal defendant asserts that the trial justice committed prejudicial error in permitting plaintiffs to testify about what other doctors had told them and about what others were saying.

"While [the rule prohibiting the use of hearsay] prohibits the admission of extra-judicial utterances which are offered as credible testimonial assertions, it is not directed against statements which are not offered to establish the truth of the matters asserted therein." *Allen v. D'Ercole Construction Co.*, 104 R.I. 362, 369, 244 A.2d 864, 869 (1968). Whether or not one is defamed depends on the effect the publication had upon those who received it. Therefore, testimony of plaintiffs and their witnesses about what other people were saying concerning their understanding of the libelous statement is admissible to establish the extent to which the statement was read in the community and the effect that it produced. *Chagnon v. Union-Leader Corp.*, 103 N.H. 426, 436, 174 A.2d 825, 832 (1961). Because this testimony was not offered to establish the truth of the matters asserted therein and was otherwise relevant, the trial justice properly overruled defendant's hearsay objections.

At the close of plaintiffs' case, the trial justice denied defendant's motion for a directed verdict on the issue of compensatory damages but granted its motion for a directed verdict on the issue of punitive damages. The defendant contends that the trial justice erred in denying its motion on the issue of compensatory damages. Not surprisingly, plaintiffs contend that he erred in granting defendant's motion on the issue of punitive damages.

In reviewing a decision of the trial justice on a motion for a directed verdict, we are bound by the same rules that govern the trial justice. We examine all the evidence in a light most favorable to the opposing party without considering the weight of the evidence or the credibility of the witnesses. We draw from that evidence only those reasonable inferences that support the opposing party's position. If such examination reveals evidence upon which reasonable minds could differ, then the motion should be denied and the jury should be left to determine the facts of the case. *Marcotte v. Harrison*, —— R.I. ——, ——, 443 A.2d 1225, 1229 (1982).

"The question of whether or not the meaning of a particular communication is defamatory, is one of law for the court." *Elias v. Youngken*, 493 A.2d 158, 161 (R.I. 1985). A "plaintiff * * * in order to recover, [must show] that the publication was defamatory either per se or by reason of its susceptibility of the defamatory meaning attributed to it by way of innuendo." *Andoscia v. Coady*, 99 R.I. 731, 735, 210 A.2d 581, 584 (1965). In addressing defendant's motion for a directed verdict on the issue of compensatory damages, the trial justice had to determine whether reasonable minds could find that defendant's publication of the allegedly libelous statement amounted to spite or ill will, which would subject plaintiffs to public hatred, ridicule, or contempt.

Drawing all inferences favorable to plaintiffs, the trial justice had before him in the record evidence that plaintiffs had complied with the terms of their contract by giving 120 days' termination notice. Vitello had acknowledged in his letter to the nurses of August 13 that plaintiffs had a right under their contract to do so. Yet in his letter of August 16 he asserted that they were no longer willing to honor their contract. Witnesses who were peers of plaintiffs testified that they clearly understood Vitello's statement to mean that plaintiffs were abandoning their professional obligations in the emergency room. As a result plaintiffs were professionally and socially ostracized; one plaintiff's application for staff privileges at another

area hospital was even denied after discussion of the St. Joseph's Hospital controversy. Moreover, although the trial justice initially recognized as a matter of law that a qualified privilege attached to defendant's communication, *see Ponticelli v. Mine Safety Appliance Co.*, 104 R.I. 549, 555, 247 A.2d 303, 307 (1968), he concluded that Vitello's statement, when considered in conjunction with defendant's letter sent to the nurses two days earlier, which correctly stated the nature of plaintiffs' position, was sufficiently indicative of bad faith and ill will that a jury could find that the privilege was forfeited. *See Swanson v. Speidel Corp.*, 110 R.I. 335, 341, 293 A.2d 307, 311 (1972) and *Coleman v. Newark Morning Ledger Co.*, 29 N.J. 357, 381, 149 A.2d 193, 203 (1959) (whether qualified privilege forfeited was a matter for the jury to decide). On the record before us we conclude that plaintiffs had made out a prima facie case. Therefore, the trial justice's denial of the motion for directed verdict on the issue of compensatory damages was appropriate.

"Whether [the] facts [are] adequate to support an award of punitive damages is a question of law for the court to decide." *Sherman v. McDermott*, 114 R.I. 107, 108, 329 A.2d 195, 196 (1974). This court has indicated that a proper case for punitive damages exists only when there is "evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished." *Hagan v. Providence and Worcester R.R. Co.*, 3 R.I. 88, 91 (1854). Therefore, with regard to defendant's motion on the issue of punitive damages, the trial justice had to determine whether reasonable minds could find that defendant published the statement with such willfulness, recklessness, or wickedness as to support such an award.

In this case the record fails to reveal anything about the attitude of Vitello or of any other executive of the hospital that could permit the jury to find that Vitello's publication of the libelous letter was motivated by such willfulness, recklessness, or wickedness. Although Vitello's sending of a letter to emergency room nurses with language different from that of the libelous letter sent only two days later is indicative of bad faith, which could constitute spite or ill will if the jury so found, his action and the language itself— "no longer willing to honor the contract in its present form"—suggest nothing so willful, reckless, or wicked as to warrant an award of punitive damages. Thus, the trial justice's granting of the directed verdict on this issue was proper.[2]

The defendant next contends that the trial justice erred in denying its motion for a new trial on all issues. We disagree. The trial justice independently considered all of the material evidence in the case in light of his charge to the jury and passed on its weight and the credibility of the witnesses. In doing so, he fulfilled his duty under *Barbato v. Epstein*, 97 R.I. 191, 193, 196 A.2d 836, 837 (1964).

In his decision on the motion for a new trial, the trial justice, after referring specifically to the many instances in which physicians who received the letter of August 16 had believed that plaintiffs were abandoning the hospital in violation of their contractual obligation, said:

"I'm satisfied that the evidence shows [that] the average person for whom the letter was intended, could fairly take from it a statement to the effect that the plaintiffs were abandoning their arrangement with the hospital in violation of their contract, which was not the fact of the matter. As to malice, the requirement was that spite or ill will be shown.

---

2. Although the issue was not raised or briefed by the parties, we would point out that this court has held that a principal's liability for the libel of its agent generally extends only to compensatory damages, not to punitive damages,

"when the principal neither expressly nor impliedly authorized or ratified the act * * *." *AAA Pool Service & Supply Inc. v. Aetna Casualty and Surety Co.*, —— R.I. ——, ——, 479 A.2d 112, 116 (1984).

To the Court's mind there was adequate evidence of spite or ill will, the principal evidence of this, of course, is the letter that was sent to the staff, to the nursing staff of the emergency room, which spelled the matter out in more detail and certainly in a far less unacceptable way."

■ Our review of the record indicates that the trial justice did not overlook or misconceive any evidence and that competent evidence existed to support the verdict on the issue of liability. Therefore, the trial justice properly denied the motion for a new trial.

Finally, plaintiffs contend that the trial justice erred in conditioning his denial of defendant's motion for a new trial upon each plaintiff's filing a remittitur of $160,000.

■ Before ordering a new trial on the question of damages, the trial justice has a duty to give plaintiffs an opportunity to file a remittitur. *Roberts v. Kettelle*, 116 R.I. 283, 301–02, 356 A.2d 207, 218 (1976). Since the trial justice carried out his duty in that regard, the only question before us is whether he erred in finding that the verdict was grossly excessive.

On the question of damages, this court has stated that

"the fixing of damages, while initially a jury's responsibility, may be interfered with by a trial justice on a motion for a new trial if, in the exercise of his independent judgment in passing upon the evidence adduced with respect thereto, he finds that the award is grossly in excess of an amount adequate to compensate for the injuries sustained." *Wood v. Paolino*, 112 R.I. 753, 755, 315 A.2d 744, 745 (1974).

In making that determination, the trial justice "should at least refer sufficiently to what prompts his action in order to enable a reviewing court to determine whether his interference with the verdict was based upon a misconception or oversight of material evidence or was otherwise clearly wrong." *Id.* at 755–56, 315 A.2d at 745.

■ In this case, we are satisfied that the trial justice met these requirements. He indicated, as he is obliged to do, his reasons for concluding that the jury's award was so grossly excessive as to shock the conscience. *See Devine v. United Electric Railways*, 85 R.I. 170, 172, 128 A.2d 334, 335 (1957); *Tilley v. Mather*, 84 R.I. 499, 502, 124 A.2d 872, 874 (1956). He reviewed the evidence in detail and concluded therefrom that the libelous letter was one of a number of factors that could have provoked an adverse reaction among plaintiffs' colleagues. He observed that there was neither evidence that Dr. Gordon actually suffered a financial loss as a result of the letter nor evidence that the letter was the sole reason for Dr. DeLuca's changing his field from radiology to orthopedics and leaving this area to practice elsewhere. He recognized that some shame and humiliation resulted from the publication of the letter but concluded that the absence of evidence regarding their actual financial injury made the jury's assessment of damages grossly excessive.

Since our review of the record indicates to us that the trial justice did not overlook or misconceive any material evidence and was not clearly wrong, his decision will not be disturbed.

The appeals of all parties are denied and dismissed. The case is remanded to the Superior Court for a new trial on the issue of damages only unless each plaintiff shall, within thirty days of the date of this opinion, file in the office of the clerk of the Superior Court a remittitur of all of the verdict in his case in excess of $15,000. If such remittiturs are filed, the Superior Court is directed to enter judgment for each plaintiff on the verdict as reduced by the remittitur.

WEISBERGER, J., did not participate.