**Paul J. M. HEALEY, M.D.**

v.

**NEW ENGLAND NEWSPAPERS, INC. d/b/a The Pawtucket Evening Times.**

No. 84–351–Appeal.

Supreme Court of Rhode Island.

Feb. 2, 1987.

Joseph A. Kelly, Carroll Kelly & Murphy, John R. Mahoney, Baluch Mahoney & Gianfrancesco, Providence, for plaintiff.

Michael Horan, Pawtucket, for defendant.

## OPINION

SHEA, Justice.

This matter is before the court on the plaintiff's appeal from a directed verdict entered for the defendants. The Superior Court lawsuit for defamation arose out of two newspaper articles published by the defendant the Pawtucket Evening Times (hereinafter The Times) on June 24 and June 25, 1980, regarding the actions of the plaintiff, Dr. Paul J.M. Healey. At the close of the evidence the defendant moved for a directed verdict. The trial justice granted the motion. We reverse.

The alleged libelous publications arose from the following facts. In early June 1980 two employees of the Pawtucket-Central Falls YMCA (YMCA), Beverly Tillier and James Greene, resigned upon request by the YMCA personnel committee. A controversy among other YMCA employees developed over the discharge of Tillier and Greene. The plaintiff was president of the YMCA at this time but played no role in the discharge of these employees.

On June 23, 1980, at approximately 6 p.m., the YMCA board of directors held its monthly meeting in the physical fitness center, a structure in the YMCA complex located approximately 350 to 400 yards from the entrance to MacColl Field in Pawtucket. There was concern that a possible disturbance might take place at MacColl Field owing to the terminations of Tillier and Greene, and as a result security was hired for the meeting.

After a roll call was taken of the directors, Dr. Healey asked all who were not members of the board to excuse themselves and leave the room. At that time Gerald Lampinski, who had been active in the Darlington Plains Outpost (an affiliate of the Pawtucket YMCA), informed Dr. Healey that he was in attendance at the meeting to represent the interests of an absent member, a Mr. Sousa. Doctor Healey told Lampinski that under the rules of the meeting Lampinski would have to leave. Lampinski entered his objections and left the meeting.

Doctor Healey testified that approximately one-half hour after the meeting had begun, Frank Smith, a staff member and executive director of the Westwood Branch of the Pawtucket YMCA, approached Dr. Healey and Robert Bendl, the general executive director of the Pawtucket YMCA, and told them that Lampinski had collapsed outside at the front of the property. Doctor Healey asked Smith if he could be of any help, and according to Dr. Healey, Smith said that Dr. Healey's help was not needed because Lampinski was being attended to by two people using CPR, that a rescue vehicle was either on the scene or immediately expected on the scene, and that Lampinski was in the process of being transported to the hospital. Smith claimed that he had been advised of these events by Esselton McNulty, the executive director of the family branch of the Pawtucket YMCA, who had left the board meeting after the security guard stationed at the complex advised him of Lampinski's collapse. McNulty testified that after leaving the board meeting, he was informed by Raymond Bergeron, a YMCA member who had been picketing at MacColl Field, that Lampinski had collapsed, that he was being attended by a medic, and that an ambulance had been called. The board meeting continued while the conversation between Smith, Bendl and Healey took place. After the exchange among these three individuals concluded, Dr. Healey continued to preside over the meeting.

At approximately 10 p.m. on June 23, 1980, Dr. Healey contacted the coronary care unit of the hospital to which Lampinski had been transported. Doctor Healey learned that Lampinski had died.

On June 23, 1980, Edward Gaulin, a reporter for the Times, was present at MacColl Field and saw Lampinski collapse at approximately 6:15 p.m. Gaulin and two unidentified males then administered CPR to Lampinski. Approximately five to ten minutes elapsed between the time Lampinski collapsed and the time the emergency vehicle arrived at the scene.

At MacColl Field on the evening in question, Gaulin talked to Bergeron, who complained that no one had come out of the board meeting to assist Lampinski.

On June 24, 1980, defendant published an article by reporter Gaulin about the previous evening's events. The first edition of the paper was published without any reference to criticism of Dr. Healey. However, the fourth edition of the article reported that Bergeron, a friend and supporter of Lampinski, was critical of plaintiff, a surgeon, for his failure to respond to Lampinski's collapse. On June 25, 1980, defendant published another article stating that members of Lampinski's family, after reading the fourth edition of the article of June 24, were angry because they felt Lampinski should have been given early attention by either a doctor or a paramedic at the board meeting.

Lampinski's sons, John and Jeffrey Lampinski, testified that after they had received several calls from friends and relatives outraged over the doctor's apparent lack of response to Lampinski's collapse, they contacted a few other persons who had witnessed the incident. After hearing different versions of the events surrounding their father's death, they went to Gaulin's office in an attempt to learn the truth.

As a result of that conversation, Gaulin wrote another article, published on June 25, 1980, reporting the sons' criticism of plaintiff for his failure to aid their father. Both sons stated that the June 25 article was a fair statement of the views expressed during their meeting with Gaulin.

At the close of evidence defendant moved for a directed verdict, and the trial justice granted the motion, stating that Bergeron and Lampinski's sons had a right to voice their opinions and that defendant had a right to report them. The trial justice declared that a libelous publication must contain a false statement of fact that is defamatory. The trial justice held that neither article contained a false statement of fact. He also declared that opinions reported accurately are not actionable.

This court performs the same function as the trial justice in reviewing a motion for a directed verdict. The evidence is viewed in the light most favorable to the nonmoving party, without weighing the evidence or assessing the credibility of witnesses, and only those inferences that support the nonmoving party's claim are drawn. If issues exist upon which reasonable persons might reach different conclusions, the motion should be denied. *Major v. Drapeau*, 507 A.2d 938, 940 (R.I.1986).

We begin our analysis by noting that an action in defamation requires proof of " '(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher;' and (d) damages, unless the statement is actionable irrespective of special harm." *Lyons v. Rhode Island Public Employees Council 94*, 516 A.2d 1339, 1342 (R.I.1986) (quoting 3 Restatement (Second) *Torts* § 558 (1977)). Furthermore, "Rhode Island law incorporates the concept of falsity into its definition of a defamatory statement."[1] 516 A.2d at 1342. As this court has stated:

"[A]ny words, if false and malicious, imputing conduct which injuriously affects a man's reputation, or which tends to

1. In *Lyons v. Rhode Island Public Employees Council 94*, 516 A.2d 1339, 1342–43 n. 4 (R.I. 1986), this court noted that the word "defamatory" at times is used to include the element of falsity and at times refers only to the particular type of language, that is, injurious to reputation and so forth. In the instant case the concept of falsity is incorporated into our definition of a defamatory statement.

degrade him in society or bring him into public hatred and contempt, are in their nature *defamatory* \* \* \*." *Elias v. Youngken,* 493 A.2d 158, 161 (R.I.1985) (quoting *Reid v. Providence Journal Co.,* 20 R.I. 120, 124–25, 37 A. 637, 638 (1897)).

This court has also stated that "[t]he question of whether or not the meaning of a particular communication is defamatory, is one of law for the court." *Gordon v. St. Joseph's Hospital,* 496 A.2d 132, 136 (R.I. 1985) (quoting *Elias v. Youngken,* 493 A.2d 158, 161 (R.I.1985)). However, whereas the threshold determination of whether a statement is capable of bearing a defamatory meaning is for the court to decide, the ultimate conclusion on whether such a meaning was indeed conveyed is for the jury to decide. *Cianci v. New Times Publishing Co.,* 639 F.2d 54, 60 (2d Cir.1980); 3 Restatement (Second) *Torts,* § 614.

In an often-quoted dictum from *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974), the Supreme Court stated:

"Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."

Relying in part on *Gertz,* the American Law Institute adopted the view of the 3 Restatement (Second) *Torts* § 566 at 170 that "a statement in the form of an opinion \* \* \* is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." This formulation was quoted with approval in *Belliveau v. Rerick,* 504 A.2d 1360, 1362 (R.I. 1986), and in *Hawkins v. Oden,* 459 A.2d 481, 484 (R.I.1983). In *Hawkins* this court quoted the language of the Restatement as follows:

" 'It is the function of the court to determine whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undis-

closed facts that justify the expressed opinion about the plaintiff or his conduct \* \* \*.' " *Id.* at 484.

Comment c to § 566 of the Restatement explains that a plaintiff may recover in a defamation action if the expressed opinion is based on undisclosed or assumed defamatory facts of which the listener is unaware. As stated by the Supreme Court of Colorado, "The opinion must appear reasonably to the listener to be based on defamatory facts which the reporter has not disclosed to the audience but which the audience can reasonably expect to exist." *Burns v. McGraw-Hill Broadcasting Co.,* 659 P.2d 1351, 1358 (Colo.1983) (opinions which imply the existence of an undisclosed factual predicate may support a cause of action in defamation); *see also Ollman v. Evans,* 479 F.Supp. 292, 293–94 (D.D.C. 1979) (under *Gertz* and its progeny, no cause of action arises unless defendant's opinions imply underlying false and defamatory statements of facts, implications that are not apparent here), *rev'd per curiam,* 713 F.2d 838, 851 (D.C.Cir.1983) (columnists' assessment of what political science profession thinks of plaintiff "implies the existence of facts inducing that conclusion \* \* \* [with] little \* \* \* factual predicate in the column in suit") (Robinson, C.J. concurring), *aff'd,* 750 F.2d 970, 985 n. 29 (D.C. Cir.1984) (given the court's own four-factor analysis about whether a statement is a fact or an opinion, a separate § 566 inquiry is not required), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

Several jurisdictions have agreed that although an expression of opinion based on revealed facts is not actionable, an expression of opinion based on undisclosed facts may be actionable. *Orr v. Argus-Press Co.,* 586 F.2d 1108, 1115 (6th Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979) (no basis for a libel suit under § 566 because reporter accurately provided the underlying facts); *Hotchner v. Castillo-Puche,* 551 F.2d 910, 913 (2nd Cir.) ("[o]pinions based on false facts are actionable only against a defendant who

had knowledge of the falsity or probable falsity of the underlying facts") *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977); *Burns v. McGraw-Hill Broadcasting Co.*, 659 P.2d at 1358, *but see Ollman*, 750 F.2d at 984–85. The American Law Institute explains this point further:

> "A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently. The difference lies in the effect upon the recipient of the communication." 3 Restatement (Second) *Torts* § 566, comment c at 173.

Applying these principles to the case before us leads to the conclusion that the trial justice was in error in directing a verdict for defendant.

The unusual twist in the case before us involves an allegation of defamation not against the opinion-givers (for example, Raymond Bergeron and the sons of Gerald Lampinski) but against reporter Edward Gaulin who, plaintiff asserts, had within his knowledge certain facts that he allegedly did not disclose in the two articles at issue. Here plaintiff contends that the readers of the articles in question could reasonably expect certain undisclosed and implied defamatory facts about Dr. Healey to exist. We agree.

With regard to the first article in question, plaintiff claims that the criticism expressed by Bergeron and quoted by Gaulin in the June 24, 1980 publication implied the assertion of undisclosed facts that simply did not exist in this case and were known to the reporter not to exist. These facts are (1) Dr. Healey was requested to aid Lampinski, (2) Dr. Healey refused the request to aid Lampinski, and (3) there was sufficient time for Dr. Healey to render aid to Lampinski after the doctor learned that Lampinski had been stricken.

Gaulin testified that he had been advised by McNulty prior to going to press that there had been no request for Dr. Healey to leave the meeting to assist Lampinski. Nevertheless, by stating Bergeron's opinion critical of Dr. Healey for having failed to aid Lampinski, Bergeron's opinion suggests the assertion of the undisclosed fact that Dr. Healey had been asked to leave the board meeting for that purpose. Therefore, when the evidence is viewed in the light most favorable to plaintiff, the facts would suggest that Gaulin knew at the time that he published Bergeron's opinion that no such request for aid had been made to Dr. Healey or anyone else at the board meeting. Had Gaulin disclosed these underlying facts, Bergeron's opinion could have been evaluated by the readers of the Times in a more objective light.

Similarly, Bergeron's criticism of Dr. Healey, as published, implied that this physician had refused to volunteer to render assistance to Lampinski. However, when the evidence is viewed in the light most favorable to plaintiff, the facts would suggest that Gaulin knew at the time that he published Bergeron's opinion that Dr. Healey neither was requested nor had refused to aid Lampinski. Indeed, plaintiff's uncontradicted testimony revealed that when Smith informed him that Lampinski had collapsed, plaintiff immediately asked Smith if he could be of any help.

Gaulin did not inform the readers of the Times that he was present at MacColl Field when Lampinski collapsed. Gaulin's presence becomes significant in light of the assertion of the third undisclosed fact, namely, that there was sufficent time to render aid to Lampinski after he had been stricken. Gaulin acknowledged under oath that approximately five to ten minutes elapsed between the time Lampinski collapsed and the time the emergency vehicle arrived at the scene. Gaulin also knew, prior to the running of the fourth edition of the story on June 24, 1980, that according

to Bergeron, the board members were not informed of Lampinski's collapse for at least half an hour, at which point there was little, if any, time to render aid to him.

The defendant maintains that Gaulin understood that Bergeron's statement which was critical of the board referred only to members of the board who did not hear McNulty's first announcement to Dr. Healey and Bendl. However, the record before us seriously calls that conclusion into doubt. When this evidence is viewed in the light most favorable to plaintiff, there is the suggestion of an undisclosed defamatory fact that if plaintiff had been inclined to aid Lampinski, sufficient time existed to do so.

▆ Although Gaulin's article of June 24, 1980, contained the caveat that Bergeron later discovered that the board of directors was not informed of Lampinski's collapse for at least half an hour, John Lampinski's outrage at the apparent callous treatment of his stricken father strongly suggests that this added fact did not settle the question of whether Dr. Healey acted in a callous and wanton manner. Accordingly, we find that Gaulin's article in the fourth edition of the Times on June 24, 1980, is capable of bearing a defamatory meaning because Bergeron's opinion may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about Dr. Healey. We also conclude that it is for a jury to decide whether more than enough facts were available to Gaulin at the time that he wrote the article of June 24, 1980, to ensure that a reasonable person could not have construed the existing facts in a manner that reflected negatively on plaintiff.

▆ The plaintiff also asserts that the article written by Gaulin and published on June 25, 1980, suffers from the same deficiencies as the June 24, 1980 article. Here too this court finds that the readers of the article in question could reasonably have expected certain undisclosed and implied defamatory facts about Dr. Healey to exist.

John Lampinski, son of the decedent Gerald Lampinski, was not in attendance at MacColl Field on June 23, 1980. However, the article states that members of the Lampinski family were angry because they felt Lampinski should have been given early attention by either a doctor or a paramedic at the board meeting. In the next sentence, the article states, "Dr. Paul J. Healey is Y President and was at the meeting when Lampinski collapsed."

The plaintiff claims that this sentence suggests that the decedent collapsed at the meeting in the presence of Dr. Healey. If so, this would be a factual error clearly within the reporter's knowledge prior to publication. The trial court found that the author of this article was "guilty of poor English." Moreover, the trial court found that any suggestion that Lampinski actually collapsed in the board meeting was dispelled in the next paragraph as follows:

"Raymond Bergeron said he was standing near Lampinski when he collapsed and immediately drove from the front parking lot of MacColl Field, where Lampinski collapsed, to the board meeting about 200 yards away to get board member, Jack Griffin, a Providence firefighter and a paramedic."

The trial court further found that "Dr. Healey could have issued a statement the following morning setting forth all the facts that were at his disposal and justified his decision not to adjourn the meeting and go tend to Lampinski." We disagree.

Although the article does later explain that Lampinski's collapse occurred about 200 yards from where the board meeting was taking place, the column may be reasonably understood to suggest the assertion of undisclosed facts that justify the expressed opinion about Dr. Healey by Lampinski's sons.

Even though it is true that when determining the meaning of a communication, one must examine all parts of the communication that are ordinarily heard or read with it, 3 Restatement (Second) *Torts* § 563, comment d at 163–64, the record

contains evidence that facts surrounding the June 23, 1980 board meeting and the collapse of Gerald Lampinski existed which were not fully disclosed by the reporter in question. Lampinski did not collapse at the board meeting; no request was made to Dr. Healey to render aid to Lampinski; Dr. Healey nevertheless offered to help Lampinski but was told such help was not necessary.

The articles of June 24 and 25, 1980 were written in a manner that suggested that plaintiff had failed to aid a person who was in need of medical attention. References to plaintiff as a doctor, coupled with the criticism allegedly directed at plaintiff by Bergeron and John Lampinski, left the public to question whether Dr. Healey acted properly on June 23, 1980.

This court affirmed the trial court's granting of the defendant's motion for a directed verdict in *Hawkins v. Oden*, 459 A.2d 481 (R.I.1983), a defamation case in which the parties had no dispute regarding the operative facts. In *Hawkins* we fur-

ther stated, "Without question the 'facts' upon which the offending statements were based had been fully disclosed." *Id.* at 484. In the case before us, unlike the factual setting of *Hawkins*, there are serious factual disputes between the parties as well as a reasonable question, when the evidence is viewed in the light most favorable to plaintiff, whether the criticism directed at plaintiff in the articles at issue was based on implied undisclosed defamatory facts that in reality did not exist.

We hold, therefore, that the trial justice was in error in granting the motion for a directed verdict. Accordingly, the appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court for further proceedings.[2]

---

**2.** The trial justice below did not reach the issue of whether the plaintiff was a public or a private figure because the court found no defamatory statement. Hereafter, therefore, the trial

court must determine, prior to sending this case to the jury, the status of plaintiff as a public or a private figure and other relevant matters incidental to this type of claim.