Paul J.M. HEALEY, M.D.

v.

NEW ENGLAND NEWSPAPERS, INC.
d/b/a The Pawtucket Evening Times.

No. 87–489–A.

Supreme Court of Rhode Island.

March 3, 1989.

Joseph A. Kelly (Carroll, Kelly & Murphy), John R. Mahoney (Baluch, Murphy & Gianfrancesco), Providence, for plaintiff.

Michael F. Horan, Pawtucket, for defendant.

## OPINION

SHEA, Justice.

This matter is before the Supreme Court on the defendant's appeal from a judgment for the plaintiff after a jury trial in the Superior Court. We affirm.

This case was originally tried before a jury in Providence County Superior Court in 1984. At the close of the evidence the trial justice granted defendant's motion for directed verdict. This court sustained plaintiff's appeal, vacated the judgment, and remanded the case to the Superior Court for a new trial. *Healey v. New England Newspapers, Inc.*, 520 A.2d 147 (R.I.1987) (Healey I). At the conclusion of that trial, which resulted in a jury verdict for plaintiff, the trial justice denied defendant's motion for a new trial and also denied defendant's motion for a directed verdict on which decision had been reserved.

The facts of this case are fully stated in *Healey I*, but must be related again for easier understanding of the issues. The lawsuit arose out of several articles published by defendant, the Pawtucket Evening Times (the Times), in June 1980. The events that gave rise to the allegedly libelous articles concerned a controversy that had developed between Pawtucket–Central Falls YMCA (YMCA) employees and board members regarding a personnel-committee decision to terminate two employees. The plaintiff, Paul J. M. Healey, M.D., a Pawtucket, Rhode Island, physician, was president of the YMCA's board of directors at the time. He had no direct involvement with the terminations. On June 23, 1980, the YMCA board of directors held its

monthly meeting. Because there was concern about a possible disturbance from protestors opposed to the two terminations, a security officer was hired to stand just outside the YMCA physical fitness center where the meeting took place. People were in fact picketing at MacColl Field, a YMCA property about 400 yards from the physical fitness center.

After a roll call was taken, Dr. Healey, who conducted the meeting, directed Gerald Lampinski to leave. Lampinski was a YMCA member who claimed to be attending the meeting as a proxy for a board member who was unable to attend. The plaintiff ruled that no arrangements for a proxy had been made and that the meeting was restricted to the board of directors. After voicing his objection Lampinski left the room.

The plaintiff testified that thirty minutes after the meeting began, Frank Smith, executive director at the YMCA Westwood branch, told plaintiff and Robert Bendl, who were seated next to each other, that Lampinski had collapsed at the front of MacColl Field. Bendl was general executive director of the YMCA at the time. The plaintiff testified that he asked if he could be of any help. Smith told him that two people were administering cardiopulmonary resuscitation (CPR) and that an ambulance was either there or on the way. The plaintiff also testified that he called the hospital that evening and learned that Lampinski had died.

Esselton McNulty, executive director of the family branch of the YMCA, testified that he saw the security officer enter the board meeting and attempt to beckon to Jack Griffin, a board member and paramedic. He said that he saw Griffin shake his head no to the officer (which Griffin later denied) so McNulty went to the officer and was informed that Lampinski had collapsed. McNulty sent Ron Mayer, executive director of the MacColl Field YMCA, to assist Lampinski. McNulty testified that he then left the building and spoke with Ray Bergeron, a YMCA member, who told him that Lampinski had collapsed, that a medic was attending him, and that an ambulance had been called. In response to McNulty's offer Bergeron said that he did not want any help, McNulty added. McNulty then returned to the board meeting where he told Smith to advise Bendl that Lampinski had collapsed, that an ambulance was on the way, and that everything was being taken care of.

Smith testified that McNulty did ask him to tell Bendl that Lampinski had collapsed, he was being attended to, an ambulance had been called, and everything was under control.

Edward Gaulin, a reporter for the Times, was at MacColl Field when Lampinski collapsed. At first Gaulin assisted another person in administering CPR to Lampinski, but he was soon relieved by someone who said he was a paramedic. Approximately five to ten minutes after Lampinski had collapsed, an ambulance arrived on the scene. Later that evening Gaulin spoke with Bergeron, who said that he was upset because, according to Griffin, the board was not informed for thirty minutes after plaintiff and Bendl had been informed that Lampinski had collapsed. Bergeron also criticized plaintiff, as a doctor, for not assisting Lampinski.

On the morning of June 24, Gaulin spoke with McNulty. McNulty testified that at that time Gaulin asked him if plaintiff had refused to aid Lampinski. McNulty said he told Gaulin that that impression was not correct, that it would be a big mistake to print that plaintiff had refused to aid Lampinski. McNulty then relayed to Gaulin the message he had given to Smith. Gaulin testified that, after unsuccessfully trying to contact plaintiff several times, he reached McNulty. Gaulin remembered McNulty's telling him that the message relayed to plaintiff was that Lampinski had collapsed, he was being treated, an ambulance was called, and the situation was well in hand. Gaulin said that he did not remember the warnings against publishing anything implying that plaintiff refused to aid Lampinski.

On June 24, 1980, the day after Lampinski's collapse, the Times published an article by reporter Gaulin about the incidents

at MacColl Field the night before. The fourth edition of the Times included the information that Bergeron, a friend and supporter of Lampinski, was critical of plaintiff, a surgeon, for his failure to respond with aid to Lampinski's collapse.

Lampinski's son, John, testified that on the evening of June 24 he received several phone calls from friends and relatives. They expressed their outrage because of the June 24, fourth-edition article. John Lampinski testified that he was outraged and upset at plaintiff after reading the article. The next day, June 25, after speaking with several people who had witnessed the incident or attended the board meeting and after hearing several different versions of the events surrounding Lampinski's collapse, John Lampinski and one of his brothers went to speak with Gaulin to express their displeasure about plaintiff's apparent lack of response to his father's collapse. During this meeting Gaulin did not reveal to the Lampinski sons that he had been an eye-witness to the collapse, that CPR had been administered to Lampinski within one minute of his collapse, and that only five to ten minutes had elapsed between the time of Lampinski's collapse and the arrival of the ambulance.

On June 25, 1980, another article, written by Gaulin, entitled "Lampinski sons angry at YMCA board," was published. It related again that Lampinski died of a heart attack during a protest against the YMCA board of directors. The article further related that Lampinski's son, John, said that he was upset with the board for ordering Lampinski to leave the board meeting. The article then stated:

"John [Lampinski] also said the family is also angry because they feel Lampinski should have been given early attention by either a doctor or a paramedic at the board meeting.

Dr. Paul J. Healey is Y president and was at the meeting when Lampinski collapsed."

John testified that the June 25 article accurately stated his views that he expressed during his meeting with Gaulin.

The first issue defendant raises on appeal is its claim that the trial justice erred in the instruction to the jury regarding plaintiff's burden of proof. We have said that in a defamation action the plaintiff must prove " '(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher'; and (d) damages, unless the statement is actionable irrespective of special harm." *Lyons v. Rhode Island Public Employees Council 94*, 516 A.2d 1339, 1342 (R.I.1986) (quoting Restatement (Second) *Torts* § 558 (1977)).[1]

With regard to the first element of the standard, we have stated, "[A]ny words, if false and malicious, imputing conduct which injuriously affects a man's reputation, or which tends to degrade him in society or bring him into public hatred and contempt, are in their nature defamatory * * * ." *Elias v. Youngken*, 493 A.2d 158, 161 (R.I.1985) (quoting *Reid v. Providence Journal Co.*, 20 R.I. 120, 124–25, 37 A. 637, 638 (1897)). We have also adopted the doctrine that a statement in the form of an opinion may be defamatory and therefore actionable if and only if "it implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Belliveau v. Rerick*, 504 A.2d 1360, 1362 (R.I.1986) (quoting 3 Restatement (Second) *Torts* § 566 at 170). *See also Healey v. New England Newspapers, Inc.*, 520 A.2d 147 (R.I.1987).

In her instructions to the jury the trial justice explained this doctrine by stating that the jury "should consider whether the reporter, Edward Gaulin, failed to disclose to the reader facts available to him." The trial justice further instructed:

"If you find that the reporter had available to him facts that he failed to reveal, and the disclosure of these facts would

**1.** In *Healey v. New England Newspapers, Inc.*, 520 A.2d 147, 149 n.1 (R.I.1987), we noted the dual definitions of "defamatory." Here, as in *Healey*, the concept of falsity is incorporated into our definition of a defamatory statement. *See Lyons v. Rhode Island Public Employees Council 94*, 516 A.2d 1339, 1342–43 n.4 (R.I. 1986).

have ensured that a reasonable person could not have construed the existing facts in a manner which reflected negatively on Dr. Healey, you may find that the defendant defamed the plaintiff."

The trial justice also instructed the jury that truth is a complete defense in an action for libel no matter how much harm is done by the statements. She emphasized that "[t]he plaintiff has the burden of establishing that the publications complained of are false. * * * So long as the gist or the sting of the publication is true, the publication is not false." Finally the trial justice explained that plaintiff must "prove that which he asserts or claims by a fair preponderance of the evidence." After a careful review of the instructions given to the jury regarding the law of defamation and the burden of proof, we find no error with the instructions.

■ Next defendant cites *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and *Major v. Drapeau*, 507 A.2d 938 (R.I.1986), to support its argument that plaintiff is a "limited purpose public figure" for the purposes of this action. In *Major v. Drapeau*, this court adopted the standard set forth in *Gertz*, where the Supreme Court held that there are two bases for designating an individual a public figure for purposes of defamation actions:

"In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." 418 U.S. at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812.

The Court then further defined the "limited purpose public figure" designation:

"We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes. * * * It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." 418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812.

Considering the nature and extent of plaintiff's participation in the events surrounding Lampinski's collapse, we agree with the trial justice that plaintiff is a private figure for the purposes of this defamation action. The plaintiff was the president of the board of directors of the YMCA when the article in question was published. Further, the controversy over the YMCA personnel decision to terminate two long-term employees attracted publicity during the summer of 1980. However, the controversy giving rise to the defamation did not involve plaintiff's role as president of the board of directors or the public controversy over the terminations. The defamatory statements involved plaintiff's role as a physician and his implied inaction in response to the collapse of a person in need. The article's reference to plaintiff's profession is a reference to his private life, not his public life. Although Lampinski's collapse and subsequent death may have been of public interest, in light of both plaintiff's role as president of the board of directors and Lampinski's role in the controversy over the YMCA employee terminations, the "newsworthy" nature of the incident does not make plaintiff a public figure. *See Wolston v. Reader's Digest Ass'n. Inc.*, 443 U.S. 157, 167, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450, 460 (1979) ("[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention").

■ The defendant also argues that the trial justice should not have waited until the conclusion of defendant's case to determine whether plaintiff was a public or a private figure. In *Healey I*, 520 A.2d at 153 n.2, we stated in a footnote, "[T]he trial court must determine, prior to sending this case to the jury, the status of plaintiff as a public or a private figure * * * ." The trial justice has complied with this directive. We find no error.

■ The defendant next challenges the admission into evidence of statements made by third parties not present at trial concerning the articles in question. In *Gordon v. St. Joseph's Hospital*, 496 A.2d 132 (R.I.1985), also a defamation case, the trial justice allowed witnesses to testify about what other people had said about the plaintiffs, people who had read the allegedly defamatory statement but who were not present at trial. This court held that "testimony of plaintiffs and their witnesses about what other people were saying concerning their understanding of the libelous statement is admissible to establish the extent to which the statement was read in the community and the effect that it produced." *Id.* at 136 (citing *Chagnon v. Union–Leader Corp.*, 103 N.H. 426, 436, 174 A.2d 825, 832 (1961)). Here these statements are not offered to prove the truth of the matter asserted but are relevant to establish the effect of the publication on those who received it. This exception, as set forth in *Gordon*, is now reflected in Rule 803(3) of the Rhode Island Rules of Evidence. The trial justice properly overruled defendant's hearsay objections.

In reviewing the denial of defendant's motion for a directed verdict, this court must exercise the same function as that of the trial justice. We must view the evidence in the light most favorable to the nonmoving party, without weighing the evidence or assessing the witnesses' credibility, and draw from the evidence only those inferences that support the nonmoving party's claim. If reasonable minds could differ regarding issues of fact, the motion must be denied, leaving the decision for the jury. *Healey*, 520 A.2d at 149; *Major v. Drapeau*, 507 A.2d at 940; *Haxton's of Riverside, Inc. v. Windmill Realty, Inc.*, 488 A.2d 723, 725 (R.I.1985).

■ The defendant argues that plaintiff did not establish that the allegedly defamatory statements were false and malicious and that the defendant was negligent in the republication of the statements. In *Healey I*, 520 A.2d at 152, we found that readers of the John Lampinski statement in the June 25 article could reasonably have

found that it implies several undisclosed defamatory facts. The language could be understood to imply that Lampinski collapsed at the board meeting, that plaintiff was requested to assist Lampinski and that plaintiff refused this request, and that there was ample time for plaintiff to render aid. We also stated that when determining the meaning of an allegedly defamatory communication, one must examine all parts of the communication that are heard or read with it. *Id.* (citing 3 Restatement (Second) *Torts* § 563, comment d at 163–64).

In the article in question Gaulin does explain that Lampinski collapsed 200 yards from the board meeting, that Lampinski received CPR, and that several people at the board meeting disputed the negative implications created by the John Lampinski statement. However, Gaulin was at the scene when Lampinski collapsed. He knew Lampinski was immediately given CPR. In fact, Gaulin first assisted in the CPR and then was relieved by a person claiming to be a paramedic. Gaulin also knew that an ambulance arrived at the scene within five to ten minutes of Lampinski's collapse.

Looking at the evidence in the light most favorable to plaintiff, one could reasonably conclude that by including the John Lampinski opinion in the article, defendant created the implication that plaintiff was asked and refused to help Lampinski and that there was enough time for plaintiff to render aid to Lampinski. The evidence could support a finding that defendant knew these implications were false or that it acted in reckless disregard of whether these implications were true or false by failing to disclose the firsthand information that would have dispelled the defamatory implications in the article as it was published. The "defamation" at issue here really consists of what was left unprinted as well as what was actually printed. We conclude, therefore, that the trial justice correctly denied the motion for a directed verdict.

■ The defendant argues that plaintiff failed to meet his burden of proving actual damages. This court has held that an

award of compensatory damages may be based upon the mental anguish and humiliation experienced as a result of a defamatory statement. *Bosler v. Sugarman,* 440 A.2d 129, 132 (R.I.1982). That standard applies to this case. Drawing all inferences in favor of plaintiff, we conclude that there is ample evidence that plaintiff suffered mental anguish and humiliation as a result of the impressions relayed to plaintiff by family, friends, and professional associates after they read the article in question.

■ The defendant argues that plaintiff failed to establish his entitlement to punitive damages. Because plaintiff has been determined to be a "private figure," he has the burden of proving by clear and convincing evidence that defendant acted with actual malice in publishing a story that contained the implication of undisclosed defamatory facts. Actual malice is either knowledge that a statement is false or reckless disregard for the truth or falsity of the statement. *Major v. Drapeau,* 507 A.2d at 940–41 (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 755, 105 S.Ct. 2939, 2943, 86 L.Ed.2d 593, 600 (1985), and *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964)). As we have stated, the record reveals that information was available to Gaulin prior to publishing the June 25 article that he could have included in the article to clarify any confusion about what plaintiff was asked or told and how he responded; that Gaulin witnessed Lampinski's collapse and remained on the scene and therefore had personal knowledge that plaintiff's conduct was not reprehensible in any way; and that John Lampinski was not at the scene when his father collapsed. The publication of John Lampinski's state-

ment gave rise to an inference that plaintiff refused to help a person in need of medical attention. The evidence could support a finding by the jury that defendant either knew this implication was false or recklessly disregarded determining whether it was true or false.

■ Next defendant complains that the trial justice did not instruct the jury that defendant's conduct must amount to "criminality" in order for plaintiff to recover punitive damages. We would point out that this court has adopted the "actual malice" standard set forth by the Supreme Court in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), for an award of punitive damages in a defamation action. In *DeCarvalho v. daSilva,* 414 A.2d 806, 812–13 (R.I.1980), we stated that

> "it appears that the present state of the law, as enunciated by the Supreme Court of the United States, imposes upon states two major bodies of restrictions in respect to allowing recovery for defamatory publications. * * * In the event that exemplary damages are to be awarded, then the 'actual malice' element must be shown by clear and convincing evidence."

As we have said, actual malice is actual knowledge of the falsehood or reckless disregard for the truth or falsity of the allegedly defamatory material. Similarly, in *Gordon v. St. Joseph's Hospital,* 496 A.2d at 137, we stated that in a defamation action, the evidence must support a finding that "defendant published the statement with such wilfulness, recklessness, or wickedness as to support [a punitive damages] award."[2] The evidence in this record would certainly warrant a jury's concluding that plaintiff had established ac-

---

**2.** In *Gordon v. St. Joseph's Hospital,* 496 A.2d 132, 137 (R.I.1985), we quoted language from *Hagan v. Providence and Worcestor R. R. Co.,* 3 R.I. 88, 91 (1854), which was not a libel case, that in order to warrant a punitive damages award there must be "evidence of such wilfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished." When

we applied this standard to the defamation action at issue in *Gordon,* we did not apply the criminality standard. This elimination is consistent with our case law on defamation and the *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) directive to apply the "actual malice" standard to claims by private individuals alleging defamation and claiming punitive damages.

tual malice by clear and convincing evidence.

 We also reject the argument that the verdict was so inconsistent as to indicate that the jury did not understand the trial justice's instruction or the application of the law to the facts. The plaintiff had alleged that each of the articles printed on the twenty-fourth and twenty-fifth of June were defamatory. The jury found only the last, the June 25 article, to be defamatory. The plaintiff argues that there are underlying factual distinctions between the two articles that would warrant this jury determination. We agree.

The June 25 article contains a republication of John Lampinski's opinions regarding his father's treatment at the board meeting and upon his collapse. The June 24 article does not. Further, the June 25 article was printed after the reporter had an opportunity to speak with several people who said that the plaintiff had not been asked to assist Lampinski and had been told that everything was in hand. The June 24 article was printed prior to the reporter's receiving this information. Finally, John Lampinski received all his information about his father's collapse from other people who were either at MacColl Field or in the board meeting. John Lampinski's opinion, republished in the June 25 article, implies that Dr. Healey could have, but refused to, aid Gerald Lampinski. Gaulin was a witness to the collapse. He immediately rendered aid to Lampinski and knew that an ambulance arrived within five to ten minutes of Lampinski's collapse. Gaulin did not tell John Lampinski that he witnessed the entire event. We believe a jury could find that the publication of John Lampinski's opinion in the second article implied undisclosed defamatory facts known to the defendant to be false or was in reckless disregard for their truth or falsity. The verdict, in our opinion, showed no inconsistency but rather showed that the jury perceived the different legal effect of the articles resulting from the different quantum of information Gaulin possessed as the successive publications and republications occurred.

For these reasons the defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers of the case are remanded to the Superior Court.